POPIELARSKI *v.* JACOBSON.

1. FRAUD—EVIDENCE—CONSPIRACY—SALE OF THEATER BUSINESS.
    Evidence presented in action for fraud in the sale of a theater business *held,* to present a question for the jury as to whether some of the defendants had conspired by false representations to defraud plaintiffs and whether plaintiffs relied on such representations.

2. SAME — EVIDENCE — SALE OF THEATER BUSINESS — HOT SPOT — MONEY MAKER.
    The term "hot spot" in real estate broker's advertisement of theater business is ignored in view of the fact that the main misrepresentation of which plaintiffs complain in their action for fraud consisted of the statement that the theater was a money maker.

REFERENCES FOR POINTS IN HEADNOTES
[1]  24 Am Jur, Fraud and Deceit §§ 292, 296.
[3, 4]  24 Am Jur, Fraud and Deceit § 209 *et seq.*
[4]  23 Am Jur, Fraud and Deceit § 26.
[4]  Validity and effect of stipulation to the effect that vendee or purchaser does not rely upon representations of vendor or seller, or the latter's agent.  10 ALR 1472.
    Provision in sale contract to the effect that only conditions incorporated therein shall be binding.  75 ALR 1032.
[5]  23 Am Jur, Fraud and Deceit § 24.
[6]  11 Am Jur, Conspiracy § 3.
[7]  23 Am Jur, Fraud and Deceit §§ 172, 175.
[8]  24 Am Jur, Fraud and Deceit § 200.

3. SAME—SUBSEQUENT WAIVER.

Fraudulent representations that theater business was a money maker, made before binding preliminary agreement was executed and substantial deposit made by plaintiffs, were not waived, as a matter of law, by their signing of statement at time lessor's consent to assignment of lease was obtained that no representations had been made as to income, operations or expenses in the operation of the theater and that plaintiffs took the premises as is and at their own risk.

4. SAME—WAIVER CLAUSE IN EXECUTED CONTRACT.

A clause in a contract that purchasers of an interest in property involved enter into the agreement in reliance on their own observations and not because of any representations of any facts by other party is ineffective against fraud by the latter in procuring execution of the agreement.

5. SAME—SALE OF THEATER BUSINESS—REALTORS.

Realtors *held,* liable for fraud perpetrated upon plaintiff purchasers of theater leasehold interest, where there is evidence that they not only inserted advertisement in newspaper offering theater for sale but drafted preliminary contract of sale after telling plaintiffs it was unnecessary for them to procure an attorney and exhibited a check as being an offer of deposit from someone else.

6. CONSPIRACY—DEFINITION.

A conspiracy is a preconceived plan to unlawfully work some public or private wrong or injury by concerted action, originating in combination, either carried out by joint action or at least pursuant to a joint arrangement and understanding.

7. SAME—FRAUD—THEATER BUSINESS.

Defendant theater owners who made representations to plaintiff purchasers of leasehold interest some 10 days after latter had made a binding contract to purchase it and had given a substantial deposit *held,* not liable to plaintiffs in action for conspiracy to defraud, since fraud involved in inducing plaintiffs to purchase the leasehold interest was complete before the owners had become involved in the transaction.

8. DAMAGES—FRAUD—CONSPIRACY.

Judgment of $8,000, as reduced by trial judge from verdict of $10,000 in action for conspiracy to defraud plaintiffs in the purchase of a theater, *held,* not excessive, under the circumstances, where, although the out-of-pocket loss was some-

what uncertain, it appears that the business was represented as making $20,000 a year and, instead, was run at a very great loss.

9. FRAUD—CONSPIRACY—DAMAGES.
  Plaintiffs in action for conspiracy to defraud them in connection with the purchase of a theater business had a right to recover damages for representations that were false.

Appeal from Wayne; Miller (Guy A.), J. Submitted April 15, 1953. (Docket No. 39, Calendar No. 45,747.) Decided June 8, 1953. Rehearing denied October 5, 1953.

Action by Martin Popielarski and wife against Edward Jacobson and others for damages for fraudulent misrepresentations. Verdict and judgment, reduced by remittitur, for plaintiffs. Defendants appeal. Reversed as to defendants Schreiber. Affirmed as to other defendants.

*Lee C. McManus,* for plaintiffs.

*Joseph Freed,* for defendant Jacobson.

*Edmund W. Tropp,* for defendants Miller and Badgley.

*·Shapero & Shapero,* for defendants Schreiber.

BUTZEL, J. Martin Popielarski and Marie Popielarski, his wife, brought suit against Edward Jacobson and Mollie Jacobson, his wife, and Raymond Schreiber, Nathan Schreiber, Forest Miller and Leonard Badgley, claiming that they had conspired to induce plaintiffs by false representations to buy the Forest theater, a moving picture house situated on Woodward avenue near the corner of West Forest avenue, 2 main thoroughfares in the city of Detroit, Michigan. The case was dismissed as to Mrs. Jacobson, it being conceded that she had nothing to do with

the sale. The theater evidently was not a new one. Defendants Schreiber, as copartners, doing business as Midwest Theater Company, owned a number of moving picture theaters, including the Forest theater, in the city of Detroit. Nathan Schreiber was an uncle of Jacobson, and Raymond Schreiber a cousin. They had given Jacobson and wife a 5-year lease beginning July 1, 1948, for the Forest theater and personal property, consisting of accessories necessary to run a moving picture theater, at a rental of $500 a month. The Jacobsons, as lessees, also agreed to pay the Schreibers, their lessors, an additional $2,000 for entering into the lease. There was also deposited with them the further sum of $3,000 as security for prompt payment of rent and performance of other covenants of the lease, the amount so deposited to be applied at the option of the lessees if they lived up to the terms of the lease on the last 6 months' rent to become due under the lease. The lessees further agreed to run only films that had not been previously shown at 3 other theaters owned by the lessors, unless such films had been rejected by lessors for such theaters, 2 of which were within 3 blocks of the Forest theater, and the third was not so near. Lessees thus agreed not to compete with the lessors on motion picture films which the lessors desired to display at 3 competing theaters.

On Sunday, January 8, 1950, plaintiffs Popielarski were attracted by the following advertisement in a local paper:

"Theater. Hot spot. Good money maker. Full price, $5000, $2500 down. Ask for Mr. Sherlock. B. & M. Realty, TR. 5-3350. 2294 West Grand Boulevard. Open 9 to 9."

The B & M Realty Company was a copartnership, consisting of Leonard Badgley and Forest Miller,

defendants herein. In the afternoon of the day the advertisement appeared, plaintiffs went to the office of the realty company and were told by Mr. Sherlock, mentioned in the advertisement and in charge of the office, that he did not have the keys, but he gave plaintiffs the location of the theater so that they could see the exterior. The theater was closed, but plaintiffs were attracted by its front. That evening they returned to the real estate office where they met defendants Jacobson and Badgley and also Sherlock, all of whom took plaintiffs to the theater. It was dark, only 1 light in the lobby being lit. It was explained to plaintiffs that the fuses were disconnected. A cursory inspection of the premises was made. Plaintiffs saw that the lobby was upset, the candy concession in disorder, and a section of the seats roped off, but nevertheless they were well impressed as far as they could determine. At that time it was also suggested that a film be run in order to try out the projection equipment. The Popielarskis accompanied Jacobson to the projection booth, where a film was run off. When Mr. Popielarski noticed that there was no sound, Jacobson explained that he did not have any sound film available, but he assured plaintiffs that the sound equipment was in good working order. This was not true, but it was subsequently put in good order at some expense. Jacobson at that time, reading from a memo book which he took from his pocket, made the statement that the theater had grossed $28,000 in 1948 and also in 1949; that he had made a profit of $20,000 in the previous year; that the reason he was selling was in order to pool his resources with another person in order to open a large theater in Texas; that as he did not have the time to look after the Forest theater he had closed it; and that he had run it on New Year's Eve and made $500 on that one night, an amount sufficient to pay a month's rent. After

seeing the film Popielarski asked to see the heating system. Jacobson took him down the stairway, but they were unable to see the heating equipment because the basement was flooded. Jacobson explained that the sump pump needed repairs, but that he would take care of it. After this inspection, all of the parties returned to the real estate office. Plaintiffs testified that they then stated that they desired to look at the theater the following day, when there would be better light, but they offered a $25 deposit on the purchase of the lease. At that time, Badgley stepped out of the room and returned with a check for $1,800, which he said had been left during their absence as a deposit for the purchase of the theater. He told plaintiffs that their $25 was insufficient in view of the other check, and that they would have to deposit that amount or more. Plaintiffs responded with a check for $2,000. The following afternoon plaintiffs returned to the real estate office for the keys, intending to examine the theater further. Jacobson, Badgley, Sherlock and Miller were present when they arrived. Badgley presented plaintiffs with a preliminary agreement of sale for their signatures, saying that before they could go any further they had to have the instrument signed and additional money before they could get approval of the landlord. Plaintiffs stated that they thought they should see a lawyer before they signed, but were told by Badgley that the signing of the agreement was standard practice and that they did not need a lawyer at that time because they (the realtors) were there to look out for them. Plaintiffs paid the additional $2,000 called for and signed the agreement, which reads as follows:

"Detroit, Michigan, January 8, 1950.
"Received from Martin H. Popielarski and Marie Popielarski, his wife, the sum of $2,000 as deposit and part payment for Forest theater lease and de-

posit. Business located at 4635 Woodward ave. in the city of Detroit, county of Wayne, State of Michigan, which the above-mentioned party has offered to purchase (subject to approval of owner) for the sum of $5,000 in the manner as specified below, *viz:* down payment $4,000 and monthly payments of see below, per annum.

"Remarks: Seller is to take notes for the $1,000 balance to be paid as follows: $500 within 60 days from date—$500 within 120 days from date. Seller agrees to put sump pump in basement and plumbing in good working order so that it will pass city inspection. Money to be held in escrow until license has been secured. Lease dated Feb. 1st. If opened before Feb. 1st rent to begin on opening date.

"It is further agreed that an additional deposit of $2,000 will be paid by the purchaser when this agreement is accepted by the owner, or if business place is under lease, sublease on similar terms shall be given, or lease assigned at option of seller, and in any event sale shall be contingent upon approval of landlord; if assignment of lease involves escrow deposit, seller shall be reimbursed therefor and assign same.

"Deal to be closed on or before January 19, 1950, and possession given the purchaser by the owner immediately on closing of said deal, and a complete adjustment of all rents, insurance, taxes, et cetera, complying with the bulk sales law* as required by the State of Michigan.

"The stipulations aforesaid are to apply to and bind the successors, heirs and assigns of the respective parties.

"The commission of 10% shall be paid by the owner to B & M Realty & Investment Company out of the first money received, whether paid as a deposit or for any other purpose.

---

* See CL 1948, § 442.1 *et seq.* (Stat Ann § 19.361 *et seq.*).—RE-PORTER.

"It is hereby understood that all terms, conditions, and representations in the listing contract executed and signed by the owner prior to this agreement are hereby made a part of this agreement and are binding to the said owner.

"I have read the above receipt and agreement and agree to purchase the said business and/or property in accordance with all the terms and conditions as herein set forth. Both parties hereby acknowledge receipt of a true copy of this agreement.

(Sgd) MARTIN H. POPIELARSKI
          Martin Popielarski
(Sgd) MARIE POPIELARSKI
          Marie Popielarski
(Sgd) EDWARD JACOBSON
          Edward Jacobson.

Witness: (Sgd) F. L. MILLER.

"PURCHASER'S RECEIPT OF ACCEPTED OFFER.

"The undersigned purchaser hereby acknowledges the receipt of the seller's signed acceptance of the foregoing offer to purchase.

(Sgd) MARTIN H. POPIELARSKI
(Sgd) MARIE POPIELARSKI

"Dated: 1–9–1950."

After the agreement was signed, and plaintiffs thus were bound, plaintiffs and Jacobson went to the office of the Schreibers, doing business as the Midwest Theater Company, the lessors whose consent was necessary to the assignment of the lease which contained some restrictions. On the way Jacobson told plaintiffs that they could not go wrong in their purchase, that he had made money while he operated the theater, and he showed them a picture of an uncle who, he stated, had made large profits from the theater and who was a retired millionaire living in Florida. Upon arriving at the office of the Midwest Theater Company, plaintiffs were asked to wait in the lobby while Jacobson went in to talk with Nathan Schrieber. What transpired between them

is not shown. Five minutes later plaintiffs were called into Nathan Schreiber's office and were introduced to him. He said:

"Well, You want to make lots of money? Eddie made lots of money in this show. Fine. Get your lawyer."

Plaintiffs were unable to get the attorney whom they first selected, but they did get in touch with Attorney Shur, who some years previously had done some work for them. Attorney Shur was not selected nor suggested by defendants, for whom he had never done any business although he may have once met one of them socially. He was called to testify by defendants but he claimed that his conferences with plaintiffs were privileged communications. He was only willing to testify as to what occurred in the presence of defendants. His further testimony was elicited by attorney for plaintiffs on cross-examination and thus practically the entire conversations were disclosed. Attorney Shur told plaintiffs that they should have retained him before they entered into the preliminary sale agreement which might be binding. It developed during one of several conferences that the theater had remained closed for some time except on the previous New Year's Eve, and that Jacobson had run what were known as exploitation pictures, which consisted largely of sex pictures, some with lurid titles. Plaintiffs stated, however, that they would gamble on the business. On January 19, 1950, a sale agreement was executed between Jacobson and wife and plaintiffs. It contained an escrow agreement in which Samuel Shapero was appointed escrow agent, both for the $4,000 cash which plaintiffs had paid to Badgley and the $1,000 in notes, in order to insure first parties making certain repairs to the sump pump and plumbing so as to comply with the ordinances of

Detroit, payment of bills, prorating of insurance and taxes, and that Jacobson would assist plaintiffs in opening the theater and booking pictures until the theater was in full operation. An escrow deposit to insure repair of the sump pump and plumbing so they would pass city inspection was provided for in the agreement of January 9, 1950. The sale agreement further provided that:

"No representations have been made as to income, operations or expenses in the operating of this theater, and second parties take said premises as is and at their own risk."

Mr. Shapero, as escrow agent, acknowledged receipt of the $4,000 in cash and the notes. At the same time, an agreement was entered into between the Jacobsons, the Popielarskis and the Midwest Theater Company, as follows:

"For and in consideration of $1 and other valuable consideration, to us in hand paid, the undersigned Edward Jacobson and Mollie Jacobson, his wife, herewith assign, sell and transfer unto Martin H. Popielarski and Marie Popielarski, his wife, all their right, title and interest to and in that lease entered into between the Midwest Theater Company, a registered copartnership, as landlord, and the undersigned Edward Jacobson and Mollie Jacobson, his wife as tenants, covering the Forest theater, known as 4635 Woodward avenue, Detroit, Michigan, together with the enumerated personal property therein described, which said lease is dated September 22, 1948, and which said assignment includes the right to the deposit of $3,000 heretofore deposited as security with the landlord under provision of paragraph 1 (a) of said lease; subject, however, to the following changes:

"(1) In place of 2 Simplex projection machines, there are now 2 Brinkert projection machines and heads.

"(2) In place of 2 Strong arc lamps, there are now 2 Brinkert lamps.

"(3) In addition, there is R.C.A. sound equipment, carpeting and an upright piano, all of which personal property belongs to the landlord and is to be held and returned in accordance with the provisons of the lease.

"Rent on this lease is paid to February 1, 1950, and all other conditions to date hereof have been paid by lessee.

"The undersigned assignees agree to and with the Midwest Theater Company, a registered copartnership, that they shall and will carry out the lease in accordance with its terms.

"The Midwest Theater Company, a registered copartnership, herewith accepts the said Martin H. Popielarski and Marie Popielarski as tenants for and in place of Edward Jacobson and Mollie Jacobson, his wife.

. "In witness whereof: We have set our hands and seals this 19 day of January, 1950.

Signed: EDWARD JACOBSON<br>
MOLLIE JACOBSON<br>
MARTIN H. POPIELARSKI<br>
MARIE POPIELARSKI<br>
MIDWEST THEATER COMPANY,<br>
By: RAYMOND SCHREIBER<br>
Partner"

It will be noted that the right to the $3,000 deposit was thus assigned to plaintiffs subject to their carrying out the provisions of the lease.

After the agreements of January 19, 1950, were signed and plaintiffs were bound, Jacobson went with plaintiffs to the theater, where he explained how he had operated the establishment. He told them that at the refreshment counter extra salt was added to the peanuts and popcorn in order to make the customers more thirsty. The drinking water would be turned off so that the patrons bought soft drinks in order to slake their thirst. Jacobson also

explained how, after he had run a film for a while, he would change its title and thus entice the same customers to pay to see it again.

Plaintiffs ran the theater for approximately 2 months during which they refused to run exploitation pictures. They claim to have lost upwards of $6,000 in the short time they conducted the theater. About a week before they finally closed it they inserted an advertisement in a Detroit paper as follows:

"Theater, ideal location on Woodward avenue, in the heart of Detroit. Has 500 seats at present. Can have 600 seating capacity, if desired. Recent added improvements made on R.C. current and sound, marquee, and house lights. Equipped with the new R.C.A. sound, and late project equipment. Also has been redecorated. Said to be one of the prettiest small theaters on Woodward avenue. Price, $11,500, full price. Selling due to poor health and nervous condition. Now in operation. If interested, call Lakeview 7–4143, or Temple 2–9862. Ask for Mr. Henry."

Plaintiffs claimed that the poor health and nervous condition mentioned in the advertisement was brought on by their losses. There are many other facts that were brought out by the testimony, including the difficulty of obtaining a license from the police until $25 was paid because of a previous violation. It was shown that plaintiffs were not wholly inexperienced in business. Mrs. Popielarski was a high school graduate, and she and her husband had had considerable experience in the used automobile business. From the exhibits it appears that they had run a motor sale business, also located on Woodward avenue, in Detroit. It was shown also that during the time plaintiffs ran the theater, the weather was bad; that television was just coming in, and that there was

a strike in progess in a large industry that affected business.

It would serve no purpose to further set forth the many other facts, statements, denials and explanations appearing in the testimony of this case, as set forth in a voluminous record. Neither defendants Jacobson, Schreiber nor Badgley took the witness stand. Badgley sent word he was sick at the time when he might have testified. A large part of plaintiffs' testimony is denied by defendant Miller, who was the only one of the defendants who testified. Defendants rely largely upon the cross-examination of plaintiffs and on questions of law. It became a jury question whether defendants or some of them conspired by false representations to defraud plaintiffs and whether plaintiffs relied on such representations.

One fact was brought to the attention of the jury by the trial judge, although there was not a word of testimony in regard to it at the trial. He called attention to the statement or admission made in the Schreibers' answer that at the time of the sale of the theater to plaintiffs there was $1,700 due for past rent, that this was known to plaintiffs, and that there was a cash security deposit of $3,000 to insure the observance of the lessees' covenants under the lease. The record is not clear as to when the 2 notes of $500 each were signed, but they were both delivered to the escrow agent. When defendants Schreiber consummated the assignment of the lease to plaintiffs, defendants distinctly agreed that the assignment included the right to the deposit of $3,000, and that the rental had been paid to February 1, 1950. Just what arrangements were made in regard to the $1,700 past due rent was not shown. Plaintiffs at no time denied that they knew of this $1,700 past due rent, no testimony was offered in regard to it and except for the allegation in the

Schreibers' answer, it was only referred to by the judge in his charge to the jury, in which he stated that defendants were bound by the allegations in their answer. However, the entire statement was not referred to, but only part of it. The testimony as well as the agreement still showed the entire $3,000 would be applied on the last 6 months' rent so that if the lease had been continued to the end of the term, plaintiffs would have become entitled to the $3,000. In that event the cost to plaintiffs would be $2,000—the $4,000 paid less the $3,000 deposited with the lessee, plus the $1,000 in notes, which evidently were never paid.

We pass the representation as to "hot spot" in the advertisement as this term is subject to various interpretations. It does not become important in view of the fact that the main misrepresentation consisted of the statement that the theater was a money maker.

Defendant Jacobson unquestionably made false representations in order to sell the theater to plaintiffs. He stated that it was a money maker, and that it had a "gross" of $28,000 in 1948 and 1949, and a "net" of $20,000. While in his answer and brief, he denies plaintiffs' claims in regard to these representations, he did not take the stand to so testify. He also claims that plaintiffs could not possibly have relied upon such representations, if made, for they must have known if the theater grossed $28,000 a year, the rent was $6,000 a year, and that in addition there was the cost of the film rentals, services of a ticket seller, projection operator and other help, as well as advertising, heating, lighting and other expenses, all of which show that the theater could not possibly have been netting $20,000 a year. On the other hand, there is the testimony of plaintiffs that Jacobson read the profit figures of $20,000 from a memorandum book, and plaintiffs naturally were

impressed. Whether this representation was false, and whether plaintiffs relied on it were proper questions for the jury to decide. Plaintiffs testified that he represented the theater as netting $20,000 per year, and the fact that after deducting expenses the net would be for less than that amount was indicated to the jury on the cross-examination of Popielarski. Mrs. Popielarski testified, however, that later after the $4,000 had been paid and at the time the consent to the assignment of the lease was obtained, Jacobson had stated that he made money only on the "exploitation" films, that he did not make money on the other kind.

Much stress is placed upon the fact that in the agreement of January 19, 1950, between Jacobson and the Popielarskis it was stated that there were no representations made as to income, operations and expenses, and that plaintiffs took the premises "as is" and at their own risk. It is further shown that plaintiffs' attorney prior to the execution of the agreement of January 19, 1950, called attention to this clause and told them just what it meant and they apparently understood the meaning of the term. However, at that time they had already been told about the money that Jacobson claimed to have made and they had already relied upon it in signing the agreement of January 9, 1950, which was binding. In view of the fact that the fraudulent representations were made before the binding agreement of January 9, 1950, had been entered into and the money paid, the statement contained in the instrument of January 19, 1950, after the parties were bound, was not a waiver, but at most a statement that plaintiffs subscribed to when they were already bound. At most it became a question of fact for the jury to decide whether there was a waiver or not. In *Fignar v. Schreiber*, 255 Mich 661, we held that such a clause was ineffective against fraud. We there said:

"The contract of sale and purchase contains a clause, 'It is hereby understood by the lessees herein that they are purchasing said theater and entering into this lease in reliance upon their own observations and not because of any representations or any facts made by Raymond Schreiber or any other person.' There was no reason to insert this clause in the contract unless it was prompted by a consciousness upon the part of Raymond Schreiber that he had successfully perpetrated a fraud upon the plaintiffs. Such clause is ineffective against fraud."

Defendants Miller and Badgley claim that when they advertised "Hot spot. Good money maker" they were simply acting as agents for Jacobson and on the information he gave them. This might excuse them under ordinary circumstances. Agents, as a rule, without any other actions on their part would not be liable for puffing up the advantages of a sale or in good faith imparting information given by their principal. However, defendant realtors did not stop there. When plaintiffs suggested that they should have an attorney, Badgley stated that none was necessary, that they would look after plaintiffs' interests. Miller drafted the agreement of January 9, 1950. This was not merely making out a receipt for money, but it was a formal contract and, as the circuit judge stated, it approached, if it did not constitute, an unlawful practice of the law. Further, defendant Badgley exhibited a check for $1,800, which plaintiffs claim was represented to them as being an offer for deposit from someone else, although defendant Miller testified that the check was not represented as being a deposit or an offer for the Forest theater, but instead that it was a deposit to purchase on the sale of another theater. Badgley and Miller thus actively entered into a conspiracy to defraud so as to become liable.

While it is true that attorney Samuel Shapero acted as escrow agent, probably at the suggestion of Jacobson, and he appeared at the trial of the case as the attorney for defendants Schreiber, nevertheless there is nothing in the record which would reflect upon his conduct, or indicate that he failed to do anything that he was legally bound to do. As a matter of fact, when it came to drawing the escrow agreement, according to the testimony of Mrs. Popielarski, he asked her how an inexperienced operator like herself expected to make money on a theater when an experienced operator was unable to do so. In reference to the clause that there were no representations made as to income and expenses in the operation of the theater and that plaintiffs took it at their own risk, Mrs. Popielarski stated that Shapero told her that the clause was being inserted because the plaintiffs were taking a gamble at their own risk; that he further told her that the only thing the sellers would guarantee was that the apparatus was in good condition and that on the rest of it she would have to take her own gamble. She further stated that in spite of all this, she decided to take a gamble, that "We figured any business was a gamble;" further, that she was determined to go into the picture business and that she knew what she was doing and could take care of it. However, this all occurred after the agreement of January 9, 1950, had been made and the $4,000 paid over. Plaintiffs were already bound, so too much importance cannot be placed on what occurred 10 days later, when the escrow agreement was drawn. Plaintiff stated in their brief:

"It should be borne in mind that this (a statement made by Raymond Schreiber through his agent) occurred after the preliminary agreement had been drawn up and signed and the purchase price had been paid over to the defendants and after Nathan Schreiber had on the 9th day of January, the day the

preliminary agreement was signed, told both plaintiffs that his nephew had 'made a lot of money operating this same Forest theater.'"

The conversation with Schreiber, however, took place after the money had been paid and the agreement signed prior to the meeting with Schreiber.

As to defendants Schreiber, we run into an entirely different question. Nothing can be said in exoneration of their conduct either, though it is true that there was no showing whatsoever that defendant Jacobson did not make money in the Forest theater when he first entered into the lease, though not later. The Schreibers had absolutely nothing to do with the binding contract that was made between plaintiffs and Jacobson on January 9, 1950. They were not parties to it; one of them never saw plaintiffs prior to the time of the trial of the case; and the other first saw them after the contract of January 9th had been executed, the $4,000 paid, and plaintiffs bound. Plaintiffs, therefore, could not have relied on any statement thereafter made by Nathan Schreiber. There was nothing left for defendant Schreiber to do except to give their consent to the assignment of the lease. This they did in a short agreement, which referred to some small changes in the personal property and which stated that the rent was paid to February 1, 1950, and also transferred to plaintiffs the right to the $3,000 as security deposit, to be returned to lessees if they carried out the terms of the lease or at their option to be used for payment of the last 6 months' rent.

Towards the end of the long trial the court stated as follows:

"*The Court:* Mr. Freed, if at the time when the parties got together on the 19th of January it had already been determined by the Midwest theater that it would accept the Popielarskis as their ten-

ants, that acceptance by the Midwest Company made the agreement an absolutely binding agreement. The question of the acceptance of the Popielarskis as tenants was the only condition precedent to the agreement becoming a fully binding agreement. The other matters that are related in there that are mentioned as to some repairs to be made, and the fixing of the pump, and so on, are not conditions precedent at all. They are only agreements on the part of the Jacobsons that they will do certain things, and they are a part of the contract. They are not conditions precedent to the attaching of the contractual obligations.

"*Mr. Freed:* They are not conditions precedent, your Honor, but they are indicative as to what the parties did do, and what they relied on, and what rights they had coming.

"*The Court:* I only made that statement in view of the position that you evidently take that those agreements as to repairs and so on were conditions precedent which prevented the preliminary agreement from being a binding agreement.

"*Mr. Freed:* I think that that is true substantially also, your Honor, that conditions precedent in Exhibit No 3, which had to be performed, and this is a consummation of their performance, or a waiver of their nonperformance.

"*The Court:* They are not conditions. They are just agreements. As far as the status of the preliminary agreement is concerned, the situation after they signed the preliminary agreement and paid over the $4,000 was not one in which they could back out of the agreement, because at that time they had agreed that they would take the premises, and the only condition, precedent to their getting them, was the consent of the landlord; and it was their duty to await and give the other side a fair opportunity to get that consent. They couldn't pull back at that time without giving the Jacobsons an opportunity to get that consent."

We believe the judge was absolutely correct in his last statement. However, in his charge, he left the question of liability of the Schreibers to the jury who, with the testimony of what occurred after the execution of the agreement of January 9, 1950, held the Schreibers liable.

In *Sobin* v. *Frederick*, 236 Mich 501, the law was clearly stated as follows:

"In form and allegations, plaintiff's action is planted on the theory of a conspiracy. There can be no *ex post facto* conspiracy—to do that which has already been done. The root principle upon which the law of conspiracy rests is a preconceived plan to unlawfully work some public or private wrong or injury by concerted action, originating in combination, either carried out by joint action or at least pursuant to a joint arrangement and understanding."

The judge should have directed a verdict in favor of defendants Schreiber.

The question of damages presents a somewhat more difficult question. It is conceded that plaintiffs paid $4,000 for the lease of the theater and personal property; that they further paid $1,500 rent; that they also paid $114.93 to prorate the taxes and insurance; also $200 for an operator, $200 for a cashier; $100 for a janitor, or a total of $6,114.93. Mrs. Popielarski testified that the loss from operations was $6,121 after crediting $1,067 receipts. Difficulty, however, arose when she attempted to introduce the accountant's statement to show that the amount of the loss was $6,121. It was objected to and excluded on the ground that the books themselves are the best evidence. It was shown that the accountant's statement was not written up until the business had closed. This left the amount of the out-of-pocket loss somewhat uncertain. It must be noted, however, that this was not a suit for rescission, but one for damages

arising out of a conspiracy to defraud, and there was evidence which the jury evidently believed that the business was represented as making $20,000 a year and instead of that it was run at a very great loss. Plaintiffs had a right to recover damages for representations that were false. Had they been true, plaintiffs would have made a large sum of money. The judge reduced the amount of the verdict from $10,000 to $8,000. Under the circumstances we conclude that the amount of $8,000 judgment was not excessive.

Judgment is affirmed as to defendants Jacobson, Miller and Badgley. It is reversed as to defendants Schreiber. Plaintiffs will recover costs against defendants Jacobson, Miller and Badgley. Defendants Schreiber will recover costs against plaintiffs.

DETHMERS, C. J., and ADAMS, CARR, BUSHNELL, SHARPE, BOYLES, and REID, JJ., concurred.