*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

GREGORY COOSARD and THERESIA
COOSARD,

       Plaintiffs-Appellants,

v

STEVE TARRANT,

       Defendant-Appellee.

FOR PUBLICATION
August 18, 2022
9:05 a.m.

No. 357950
Montcalm Circuit Court
LC No. 2020-027044-CZ

Before: SWARTZLE, P.J., and RONAYNE KRAUSE and GARRETT, JJ.

RONAYNE KRAUSE, J.

      Plaintiffs, Gregory and Theresia Coosard, appeal by right the trial court's order granting summary disposition in favor of defendant Steve Tarrant. This matter arises out of the sale by defendant of a parcel of real property to plaintiffs. After the purchase, plaintiffs discovered that fourteen feet of their apparent property, upon which was a fence and a garage, legally belonged to their neighbors, Janet and LeRoy Yaney. Defendant did not disclose the encroachment, plaintiffs did not obtain a survey prior to completing the purchase, and the purchase agreement contained an "as is" clause and an integration clause. Plaintiffs commenced this action, alleging fraudulent misrepresentation and innocent misrepresentation, largely premised on representations in the MLS[1] property listing and in defendant's seller's disclosure statement. We affirm.

## I. BACKGROUND

      According to the MLS property listing provided by the parties, the property was described as:

      One of kind [*sic*] vacation get away. Small newer cottage with living room and murphy bed that doubles for bedroom. Nice newer bath nicely decorated. Property has outside kitchen with granite counter tops and also inside kitchen in 12x24 extra

---

[1] MLS means "multiple listing service," a database of real properties listed for sale.

building. Landscaping is very tastefully done and ready for the family and friends bonfire. Have the friends over, enough room for them to bring their camper. Has only been used in summer months.

The listing included a photograph showing a small house with a covered porch and a covered area to one side, and a detached garage-like structure on the other side. Beyond the garage-like structure was a large wooden fence with various items and debris stacked or leaning up against it. In the forefront of the photo was a large circular patio, with another circular patio visible beyond. Beyond the fence is a tall beige or brown pole-barn, and several trees approximately two stories in height are clearly growing between the fence and the pole-barn.

On May 12, 2018, defendant executed a seller's disclosure statement. In relevant part, defendant disclosed the following:

> Features of the property shared in common with adjoining landowners such as walls, fences, roads, driveways or other features whose use or responsibility for maintenance may have an effect on the property? UNKNOWN

> Any encroachments, easements, zoning violations or nonconforming uses? UNKNOWN

> Structural modifications, alterations or repairs made without necessary permits or licensed contractors? YES

Defendant further handwrote that he had owned the property since "2009? [*sic*]", and "since I purchase property [*sic*] I been [*sic*] cleaning and making improvements to property myself." The parties' purchase agreement describes the property as "N ½ OF LOT 3 EX E 14 FT THEREOF, BLK 15 MYER'S ADDITION TO VILLAGE OF CRYSTAL." The purchase agreement did not identify any specific buildings, but it did state that "all buildings" were included with the property. The purchase agreement also provided that plaintiffs had "the right to inspect the buildings premises, components and systems." There was a check-box stating whether plaintiffs had waived their rights under that provision, but the check-box was not checked.

The purchase agreement further stated that plaintiffs were advised to "have a survey performed to satisfy Buyer as to the boundaries of the Property and the location of improvements thereon," followed by a checked check-box stating "No survey." The same provision stated that "[w]hen closing occurs, Buyer shall be deemed to have accepted the boundaries of the Property and the location of such improvements thereon." The purchase agreement provided that "Buyer agrees that Buyer is not relying on any representation or statement made by Seller or any real estate salesperson (whether intentionally or negligently) regarding any aspect of the Property or this sale transaction, except as may be expressly set forth in this Agreement, a written amendment to this Agreement, or a disclosure statement separately signed by the Seller." Finally, the purchase agreement provided that "[t]his Agreement is the final expression of the complete agreement of the parties and there are no oral agreements existing between the parties relating to this transaction."

On July 16, 2018, the defendant conveyed the property by warranty deed. Consistent with the description in the purchase agreement, the warranty deed described the property as:

The North 1/2 of Lot 3, except the East 14 feet thereof, Block 15, Myer's Addition to the Village of Crystal, according to the plat thereof recorded in Liber 2 of plats, Page 11, Montcalm County Records.

Plaintiffs and defendant both signed a "survey waiver" stating that they acknowledged they had been advised to obtain a survey but, instead, elected to "accept a policy of title insurance subject to the general survey exceptions," including an exception as to "the location of buildings and encroachments (if any)." The language "except the East 14 feet thereof" would prove important.

After the sale, plaintiffs learned that the garage, the fence, and part of the patio were located within the excluded 14-foot-wide strip. A survey was subsequently performed, which determined that a utility pole was also located within the 14-foot strip. In fact, Janet and LeRoy Yaney, who owned the land upon which the pole-barn was located, were also the owners of the 14-foot strip. According to the Yaneys, they purchased their property in 1979. The Yaneys had a survey performed at the time, and they had marker stakes or markers placed. At the time, there was already a house on the Yaneys' property, but the Yaneys had not yet constructed the pole-barn. According to David Hallett, the Yaneys' son-in-law, the survey markers were readily apparent if one was to look for them, but they did not "wave at you." Nevertheless, there is no indication on the survey that the professional surveyor noticed any such survey markers.

The subject property was, at that time, owned by the person from whom the Yaneys purchased their property (or possibly the son of the person from whom the Yaneys purchased their property). In 1979, there was a trailer on the subject property and a shed for the then-owner's lawnmower. Although the Yaneys' testimony is not entirely clear,[2] the shed was seemingly located approximately where the garage is now. Hallett identified the 1979 owners of the subject property as Lee and Deb Zuker. Hallett agreed that there had been a trailer with an add-on located on the subject property, a power pole that the Zukers put up to power a camper or travel trailer, and a "little metal shed." LeRoy Yaney also testified that the prior owners of the subject property had installed the power pole to use with a trailer, but he recalled that the trailer was removed by those prior owners. As noted, the survey shows the power pole to be located within the 14-foot-wide strip.

Defendant averred that when he purchased the property in March 2009, "there was a metal shed ('Old Shed') and a mobile home with an add-on located on the property," as well as "a travel trailer located in front of the Old Shed that was hooked up to the power pole." He averred that he "later dismantled the Old Shed and replaced it with another shed ('New Shed')," which "is in the same location as the Old Shed." The "new shed" is apparently the same structure as the "garage." LeRoy Yaney provided unclear testimony suggesting that the "old shed" may have been located where the garage is currently located. LeRoy also provided equally unclear testimony suggesting that the fence may have been erected by defendant, but the fence may also have been erected by

---

[2] Furthermore, the parties' depositions reflect that they were shown and identified structures in various photographs, but none of the scans of those photographs provided to this Court are legible.

defendant's predecessor. Hallett explained that the fence was located so close to the Yaneys' pole barn that the side door to the pole barn was unusable.[3]

Defendant averred that

At no time prior to my sale of the Lakeview Property to Gregory and Theresia Coosard was I told the Old Shed, or New Shed, was not on my Lakeview Property. Nor was I ever provided with any survey or other documentation showing that the sheds and power pole were not located on my Lakeview Property. I also never saw, nor am I aware of, any property corner stakes for the Lakeview Property or any adjoining property.

However, the Yaneys both recalled having a conversation with defendant regarding the garage on the 14-foot-wide strip. Hallett testified that he had been the first to notice the garage when he and his wife happened to be in the area, although he did not recall the date. Hallett and his wife wrote defendant a note asking him to remove the encroaching structure, duct-taped the note to the house door, and reported the encroachment to the Yaneys. According to LeRoy Yaney, he "went up there and told the guy get your stuff off of the property and stuff, get that stuff off of my property," but he did not recall when the conversation took place. LeRoy did not give defendant a copy of his survey, because he believed defendant should have obtained his own survey. LeRoy testified that defendant responded "I'm giving it to the Amish and they are going to take it off." Janet was present for the conversation but also could not recall when it occurred, although she believed it was in the summer. Janet recalled that LeRoy called defendant over and told defendant that the building was on the Yaneys' property, which defendant disputed, but defendant eventually stated "then if I have to, I'll move it, and he walked away with an attitude."

It is undisputed that defendant did not, in fact, remove the garage structure or fence. The record does not clearly disclose when or how plaintiffs learned that they did not actually own the land under the garage, but apparently at some point plaintiffs attempted to get a permit and were told by the County that the land under the garage did not belong to them. Plaintiffs contacted the Yaneys to ask if the Yaneys would be willing to sell the 14-foot-wide strip of property, but the Yaneys refused. Plaintiffs commenced this action against defendant on October 13, 2020 (Complaint). Defendant promptly moved for summary disposition pursuant to MCR 2.116(C)(8) and MCR 2.116(C)(10), generally arguing that plaintiffs failed to allege fraud with particularity and that plaintiffs' fraud claim was barred by release or the "as is" clause in the purchase agreement. The trial court inquired whether the Yaneys might be amenable to a possible settlement, but, as is readily apparent from the Yaneys' deposition testimonies, the Yaneys were not interested.

The gravamen of plaintiffs' argument below was that defendant knew about the encroachment because the Yaneys told him about the encroachment, yet defendant marketed the property as including the 14-foot strip and failed to disclose the property-line dispute. Plaintiffs further argued that an as-is clause can only shift the risk of a loss that is unknown to both parties,

---

[3] As noted, the MLS photograph shows trees of approximately two stories in height growing between the fence and the pole barn.

whereas here the evidence established a question of fact whether defendant was aware of the risk. Defendant argued that the area was known to be troublesome for property line disputes, and his disclosures of unpermitted improvements and that encroachments were "unknown" should have put plaintiffs on notice that they needed to obtain a survey before the sale. Defendant also argued that the evidence failed to show that he had been provided with any seriously credible evidence of an encroachment, and the conduct of the Yaneys would, to the contrary, have led any reasonable person to believe the 14-foot strip belonged to him and to his predecessor. The trial court concluded that defendant's seller's disclosure statement constituted "a giant red flag" and defendant did not appear to have made "an obvious and open misrepresentation," so it granted summary disposition in favor of defendant. This appeal followed.

## II. STANDARDS OF REVIEW

A grant or denial of summary disposition is reviewed de novo on the basis of the entire record to determine if the moving party is entitled to judgment as a matter of law. *Maiden v Rozwood*, 461 Mich 109, 118; 597 NW2d 817 (1999). When reviewing a motion under MCR 2.116(C)(10), which tests the factual sufficiency of the complaint, this Court considers all evidence submitted by the parties in the light most favorable to the non-moving party and grants summary disposition only where the evidence fails to establish a genuine issue regarding any material fact. *Id*. at 120. A motion brought under MCR 2.116(C)(8) should be granted only where the complaint is so legally deficient that recovery would be impossible even if all well-pleaded facts were true and construed in the light most favorable to the non-moving party. *Id*. at 119. Only the pleadings may be considered when deciding a motion under MCR 2.116(C)(8). *Id*. at 119-120. Although defendant moved for summary disposition pursuant to both MCR 2.116(C)(8) and (10), and the trial court referenced both subrules in its order, it appears the trial court and the parties agreed that it was practically granted pursuant to MCR 2.116(C)(10) because the trial court considered evidence beyond the pleadings. *Innovation Ventures v Liquid Manufacturing*, 499 Mich 491, 506-507; 885 NW2d 861 (2016).

This Court also reviews de novo the proper interpretation of a contract, with the goal of giving effect to the intentions of the parties as expressed in the unambiguous language they used. *Innovation Ventures*, 499 Mich at 507. The interpretation and application of statutes, rules, and legal doctrines is reviewed de novo. *Estes v Titus*, 481 Mich 573, 578-579; 751 NW2d 493 (2008). This Court will affirm a correct result, even if the trial court employed the wrong reasoning. *Kirl v Zinner*, 274 Mich 331, 336; 264 NW 391 (1936).

## III. THEORIES OF FRAUD

"There are essentially three theories to establish fraud: (1) traditional common-law fraud, (2) innocent misrepresentation, and (3) silent fraud." *M&D, Inc v WB McConkey*, 231 Mich App 22, 26-27; 585 NW2d 33, 36 (1998). To establish traditional common-law fraud, a plaintiff must prove the following elements:

(1) the defendant made a material representation; (2) the representation was false; (3) when the defendant made the representation, the defendant knew that it was false, or made it recklessly, without knowledge of its truth as a positive assertion; (4) the defendant made the representation with the intention that the plaintiff would

act upon it; (5) the plaintiff acted in reliance upon it; and (6) the plaintiff suffered damage. [*M&D, Inc*, 231 Mich App at 27.]

Furthermore, the plaintiff's reliance must be reasonable. *Novak v Nationwide Mut Ins Co*, 235 Mich App 675, 689-690; 599 NW2d 546 (1999). Innocent misrepresentation omits the requirement of intent to deceive, and it adds a requirement that the party who made the misrepresentation benefited from the ensuing harm to the plaintiff. *M&D, Inc*, 231 Mich App at 27-28.[4]

Defendant clearly made a variety of material representations for the purpose of selling the property; i.e., reliance by plaintiffs. Defendant never disclosed the encroachment or represented that fourteen feet of the apparent property was not part of the sale. Therefore, *if* defendant was aware of the encroachment, he seemingly committed fraud in the MLS listing, which clearly represented that the property included everything up to the fence line. Defendant would also have seemingly committed fraud in his seller's disclosure statement, because it would be untrue to say that it was "unknown" whether there was an encroachment. Defendant profited from the sale on the basis of the encroachment remaining undiscovered, and plaintiffs were harmed by the encroachment. Therefore, defendant seemingly committed innocent misrepresentation. However, as will be discussed below, the trial court properly concluded as a factual matter that defendant did not commit any knowing misrepresentations, and the purchase agreement precludes plaintiffs' innocent misrepresentation claim as a matter of law.

## IV. INTEGRATION CLAUSE AND RELEASES

Defendant argues that the purchase agreement is fully integrated, therefore precluding plaintiffs' claims to the extent those claims are based on any other communication between the parties. The purchase agreement provided that "Buyer agrees that Buyer is not relying on any representation or statement made by Seller or any real estate salesperson (whether intentionally or negligently) regarding any aspect of the Property or this sale transaction, except as may be expressly set forth in this Agreement, a written amendment to this Agreement, or a disclosure statement separately signed by the Seller." Furthermore, the purchase agreement provided that "[t]his Agreement is the final expression of the complete agreement of the parties and there are no oral agreements existing between the parties relating to this transaction." We agree that, on the basis of the above provisions, the purchase agreement is fully integrated.[5]

---

[4] Plaintiffs do not advance a claim of silent fraud.

[5] We have not found any published Michigan case that expressly and succinctly defines the specific term "integration clause." Nevertheless, it clear that an integration clause is widely understood to mean a written contractual term stating that the contract encompasses the entirety of the parties' agreements on a particular matter. See *Archambo v Lawyers Title Ins Corp*, 466 Mich 402, 413-414; 646 NW2d 170 (2002); *Blackledge v Allison*, 431 US 63, 75 n 6; 97 S Ct 1621; 52 L Ed 2d 136 (1977); *Central Transport, Inc v Fruehauf Corp*, 139 Mich App 536, 539; 362 NW2d 823 (1984); *Ditzik v Schaffer Lumber Co*, 139 Mich App 81, 83-84; 360 NW2d 876 (1984),

Therefore, as a general matter, evidence from outside the four corners of the purchase agreement is limited by the parol evidence rule. *UAW-GM Human Resource Center v KSL Recreation Corp*, 228 Mich App 486, 492; 579 NW2d 411 (1998). However, the parol evidence rule would not preclude evidence that a statement within the purchase agreement, or within the seller's disclosure statement referenced in the purchase agreement, was fraudulent. Furthermore, extrinsic evidence may be introduced to show fraud sufficient to invalidate the contract entirely. *Id*. at 492-495. The gravamen of plaintiffs' argument is that defendant committed fraud that induced plaintiffs to enter into the purchase agreement and committed fraud in the seller's disclosure statement. In other words, plaintiffs do allege that defendant committed fraud that might be sufficient to invalidate the entire purchase agreement. Therefore, the integration clause does not necessarily preclude plaintiffs from showing that defendant committed fraud in the MLS listing or in the seller's disclosure agreement. Defendant does not specifically identify the "release" upon which he relies, but in any event, fraud that would invalidate the entire purchase agreement would necessarily also invalidate a release contained within that agreement. We conclude that plaintiffs are not precluded, as a matter of law, from bringing fraud or innocent misrepresentation claims premised on (1) misrepresentations in the seller's disclosure statement, or (2) misrepresentations in the MLS listing.

## V. AS-IS CLAUSE

A contract may be rescinded where, at the time the contract was entered into, both parties were under a misapprehension of present fact that materially alters the essence of the agreement and the performance of the parties. *Lenawee Co Bd of Health v Messerly*, 417 Mich 17, 24-29; 331 NW2d 203 (1982). "Rescission is not available, however, to relieve a party who has assumed the risk of loss in connection with the mistake." *Id*. at 30. An "as is" clause in the parties' contract constitutes persuasive evidence that the purchaser assumed the risk of loss. *Id*. at 31-32. However, an "as is" clause does not "transfer the risk of loss where a seller makes fraudulent misrepresentations before a purchaser signs a binding agreement." *Lorenzo v Noel*, 206 Mich App 682, 687; 522 NW2d 724 (1994); see also *Lenawee Co Bd of Health*, 417 Mich at 32 n 16; *Popielarski v Jacobson*, 336 Mich 672, 686-687; 59 NW2d 45 (1953); *Clemens v Lesnek*, 200 Mich App 456, 460-461; 505 NW2d 283 (1993). Therefore, *if* defendant was aware of the encroachment, the "as is" clause would be a nullity as to plaintiffs' fraud claim. Because plaintiffs alleged that defendant was actually aware of the encroachment, summary disposition as to fraud on the basis of the "as is" clause would be impermissible under MCR 2.116(C)(8).

Conversely, the law is less clear regarding the effect of the "as is" clause on plaintiffs' innocent misrepresentation claim. As discussed, innocent misrepresentation is one kind of fraud in Michigan, and one of the few exceptions to the rule of *caveat emptor* in real estate sales. See *Roberts v Saffell*, 280 Mich App 397, 403; 760 NW2d 715 (2008), aff'd 483 Mich 1089 (2009); see also *Patrons' Mutual Fire Ins Co of Mich v Pagenkoff*, 213 Mich 157, 165-166; 182 NW 18 (1921). Nevertheless, innocent misrepresentation is premised upon the seller having no knowledge of the falsity of a representation, and "as is" clauses are fundamentally intended to allocate the risk of unknown losses. If a claim of innocent misrepresentation could avoid application of an "as is" clause, then "as is" clauses would essentially become universally invalid. Therefore, we conclude that an "as is" clause does preclude a claim of innocent misrepresentation. Although the trial court did not grant summary disposition on this basis, summary disposition pursuant to MCR

2.116(C)(8) would be appropriate as to plaintiffs' innocent misrepresentation claim. *Kirl*, 274 Mich at 336.

## VI. MEANS TO DISCOVER

An "as is" clause may also "transfer the risk of loss where the defect should have reasonably been discovered upon inspection, but was not." *Lorenzo v Noel*, 206 Mich App 682, 687; 522 NW2d 724 (1994). In general, "[t]here is no fraud where means of knowledge are open to the plaintiff and the degree of their utilization is circumscribed in no respect by defendant." *Schuler v American Motors Sales Corp*, 39 Mich App 276, 280; 197 NW2d 493 (1972). That general rule has an important caveat: parties do not have "an independent duty to investigate and corroborate representations" unless they were presented with some information or affirmative indication that further investigation was necessary. *Titan Ins Co v Hyten*, 491 Mich 547, 555 n 4; 817 NW2d 562 (2012); see also *Alfieri v Bertorelli*, 295 Mich App 189, 194-195; 813 NW2d 772 (2012). Therefore, an "as is" clause will not protect a seller against a claim for fraud merely because the buyer could have discovered the truth.[6] Instead, it must have been reasonable to expect the buyer to discover a defect upon inspection, and it must also be reasonable for the buyer to conduct the inspection in the first place.

We emphasize that having a survey performed prior to purchasing property would, in all cases, be the most prudent course of action. We agree with the Yaneys and Hallett that both plaintiffs *and* defendant would have been far wiser to have obtained surveys before their respective purchases. Nevertheless, we recognize that purchasers may not commission surveys, and we decline to create a rule establishing that purchasers *must* do so. Therefore, the critical inquiry is whether plaintiffs were on notice of any particular reason why it would have been unreasonable to forego a survey as to this property transaction.[7] Reasonableness generally requires consideration of context and the totality of the circumstances. See *Allstate Ins Co v McCarn*, 471 Mich 283, 290-291; 683 NW2d 656 (2004).

We agree with the trial court that the seller's disclosure statement should have alerted plaintiffs that there were likely to be problems with the property. However, the seller's disclosure statement must be considered in the context of the other information communicated to, or observed by, plaintiffs. That context includes the fact that the photo in the MLS listing unambiguously shows the fence to be in good condition, but clearly old enough to have accumulated a variety of

---

[6] Although the holding in *M&D, Inc* would seem to suggest otherwise, the property in that case was commercial, the parties were sophisticated, and significant to the holding was that the seller made no representations whatsoever and had no legal duty to do so. *M&D, Inc*, 231 Mich App at 25-26, 31-40. Equally inapplicable is *Conahan v Fisher*, 186 Mich App 48, 50; 463 NW2d 118 (1990), in which the buyers had an apparently-incompetent inspection performed that should have discovered the structural damage yet did not, so the damage was not "concealed."

[7] Defendant's counsel represented that the surveyor had opined "that this is one of the worst, if not the worst areas, for property line disputes that he's ever seen." However, there is no evidence either party was aware of that situation. Moreover, because defendant *also* failed to obtain a survey, it is somewhat disingenuous to accuse plaintiffs of precisely the same lack of diligence.

detritus.  Furthermore, the trees growing behind the fence but in front of the pole barn must have been there for some considerable time.  There is no evidence that the photo did not accurately depict the premises.  Importantly, the property was a small lot, and nothing appears to have been hidden from casual observation by passers-by.  Therefore, significant encroachments, easements, violations, and nonconforming uses are the kinds of problems one would naturally expect to be rapidly noticed and acted upon by an appropriate governmental entity or by a person with superior title.  Plaintiffs knew defendant had made some unpermitted modifications and that defendant was unaware of any encroachments, and they also knew that the garage and fence had obviously been present for a considerable time and were formally included in the conveyance.  In that context, it would have been reasonable for plaintiffs to anticipate a need to hire professionals to bring the property "up to code."  It would not have been reasonable for plaintiffs to expect a significant portion of the property to belong to a neighbor.

We reiterate that it would have been prudent for plaintiffs to obtain a survey.  However, under the circumstances, we are not persuaded that the evidence should have reasonably demonstrated to plaintiffs that they *needed* a survey, especially considering the fact that defendant also never obtained a survey.[8]  We therefore conclude that the "as is" clause in the purchase agreement does not preclude plaintiffs' claim for fraud.

## VII.  EVIDENCE OF FRAUD

However, the preceding discussion applies with equal force to defendant.  The Yaneys' neglect in objecting to the fence and garage would also have reasonably induced defendant to believe there was no encroachment.  The only knowledge of the encroachment given to defendant was (1) the note Hallett duct-taped to his door, and (2) a single conversation with the Yaneys.  Both of these communications would have appeared essentially "out of the blue," and the evidence strongly suggests they were both highly confrontational and unaccompanied by any supporting evidence.  Indeed, Hallett and the Yaneys were both vague about exactly what they told defendant, but they were clear that they did not proffer any kind of survey or other basis for verifying that an encroachment existed.  Furthermore, defendant averred that there were structures that existed in the same location before he built the current garage, and the testimony from Hallett and the Yaneys generally supported that averment.  The utility pole erected by the Zukers is within the 14-foot strip.  LeRoy's testimony even suggested, albeit not clearly, that the fence may have existed before defendant purchased the property.  Finally, the Yaneys' supposed survey markers were apparently not found by the professional surveyor, suggesting that either they did not exist or, minimally, that defendant could not have been expected to see them.  It might have been wiser for defendant to investigate following the communications from Hallett and the Yaneys.  However, it would not have been unreasonable for defendant to dismiss those communications.

In summary, the totality of the circumstances, even considering the communications from Hallett and the Yaneys, would naturally have indicated to defendant that there was no encroachment.  The trial court found no question of fact whether defendant knowingly lied about the encroachment on the seller's disclosure statement.  Because there is no other evidence

---

[8] If defendant had obtained a survey, he would have known about the encroachment himself, and he obviously would have committed fraud by failing to disclose that encroachment.

suggesting that defendant was aware of any encroachment, we agree. By necessary implication, defendant also did not knowingly lie in the MLS listing. Therefore, summary disposition was correctly granted in defendant's favor as to plaintiffs' fraud claim pursuant to MCR 2.116(C)(10).

## VIII. ADVERSE POSSESSION

We note as an aside that although the parties below expressed the belief that plaintiffs could not maintain an adverse possession claim against the Yaneys because the 15-year period had not yet run from the date defendant purchased the property, the record suggests that plaintiffs may yet have a remedy.

A claim of adverse possession will vest title to land in an invader who has "had actual, visible, open, notorious, exclusive, uninterrupted possession, hostile to the owner and under cover of claim of right" for fifteen years. *Rozmarek v Plamondon*, 419 Mich 287, 292; 351 NW2d 558 (1984) (quotation omitted). "[T]he possession must be so open, visible, and notorious as to raise the presumption of notice to the world that the right of the true owner is invaded intentionally." *Burns v Foster*, 348 Mich 8, 15; 81 NW2d 386 (1957) (emphasis omitted). Other than the requisite period of time (which is still running), it would appear that plaintiffs could easily establish the remaining elements of adverse possession.

"If 'no single period' of adverse use amounts to the 15-year statutory period, a party claiming a prescriptive interest may tack the possessory periods of their predecessors in interest 'to aggregate the 15-year period of prescription' if the claimant can show privity of estate." *Marlette Auto Wash, LLC v Van Dyke SC Properties, LLC*, 501 Mich 192, 203; 912 NW2d 161 (2018). One way to establish privity is "when there is an actual transfer or conveyance of the disputed property by parol statements made at the time of conveyance." *Id*. Notwithstanding the "as is" clause, the practical evidence reasonably suggesting that the 14-foot strip was included in the conveyance (especially in conjunction with the MLS listing and the express conveyance of "all buildings") could constitute evidence of "a parol transfer with the delivery of actual possession." See *Gregory v Thorrez*, 277 Mich 197, 201; 269 NW 142 (1936). Consequently, there is a good chance plaintiffs are in privity with defendant, so if the Yaneys have not yet commenced an action to recover possession of the 14-foot strip, plaintiffs may have established up to thirteen years of adverse possession. Furthermore, it may be that defendant was in privity with *his* sellers on the basis of what was actually conveyed. As noted, the power pole erected by the Zukers was within the 14-foot strip, there was considerable evidence that some kind of encroaching structure was already present when defendant bought the property (possibly even when the Yaneys bought their property), and the fence may even have been erected by defendant's predecessor. Clearly, no conclusions can be drawn on the basis of this record. Nevertheless, it is not immediately obvious that, even though plaintiffs cannot maintain their fraud or innocent misrepresentation claims, they lack a potential remedy.

## IX. CONCLUSION

We conclude that plaintiffs' innocent misrepresentation claim is precluded as a matter of law by the "as is" provisions of the fully-integrated purchase agreement, so summary disposition is proper under MCR 2.116(C)(8) as to innocent misrepresentation. We conclude that the trial

court correctly found no question of fact whether defendant *knowingly* misrepresented any material facts, so summary disposition is proper under MCR 2.116(C)(10) as to fraud.

      Affirmed.

/s/ Amy Ronayne Krause
/s/ Kristina Robinson Garrett