DOCTOR *v.* TURNER.

1. EVIDENCE—DECLARATIONS AS TO OWNERSHIP BY OWNERS IN POSSESSION.

In suit involving ownership and possession of land, testimony of declarations of grantees' predecessors in title, when in possession, is competent.

2. ADVERSE POSSESSION—CONSTRUCTIVE POSSESSION.

Constructive possession of land is in holder of record title.

3. SAME—MERE CLAIM OF TITLE INSUFFICIENT.

Mere claim of title, no matter how long asserted, will not ripen into title.

4. SAME—MERE ENTRY TO CUT HAY NOT NOTICE OF CLAIM OF ADVERSE POSSESSION.

Occasional or periodical entry upon land to cut wild grass is not act manifesting purpose to take possession as owner, and does not constitute actual possession.

5. SAME—NOTICE OF CLAIM OF ADVERSE POSSESSION.

To make good claim of title by adverse holding, true owner must have actual knowledge of hostile claim, or possession must be so open, visible, and notorious as to raise presumption of notice to the world that right of true owner is invaded intentionally and with purpose to assert claim of title adverse to his.

6. SAME—POSSESSION MUST BE CONTINUOUS.

To constitute adverse possession, there must be such continuity of possession as will furnish cause of action for every day during whole period required to perfect title.

7. SAME.

Possession, to be adverse, must be more than sufficient to support trespass or ejectment against stranger.

8. SAME—CASUAL CUTTING OF HAY INSUFFICIENT TO WARN OWNER OF CLAIM OF ADVERSE POSSESSION.

Casual cutting of hay, amounting to but little more than annual trespass, was not sufficient to warn record owner of claim of adverse possession.

Unbroken continuity as essential element of adverse possession, see annotation in 15 L. R. A. (N. S.) 1202.

Hostility as essential element in adverse possession, see annotation in 15 L. R. A. (N. S.) 1192.

Appeal from Muskegon; Vanderwerp (John), J. Submitted April 16, 1930. (Docket No. 60, Calendar No. 34,587.) Decided June 2, 1930.

Bill by Edith Doctor against John G. Turner and others to restrain construction of a roadway over plaintiff's land. From decree for plaintiff, defendants appeal. Reversed.

*Cross, Foote & Sessions, MacDonald & MacDonald,* and *Alexis J. Rogoski,* for plaintiff.

*George H. Cross,* for defendants.

POTTER, J. Plaintiff claimed to be the owner of the following described property located in the township of Laketon, in the county of Muskegon, and State of Michigan, to wit:

"Commencing at the quarter post on the east side of section 12, town 10 north, range 17 west, thence southerly 1067.4 feet along the section line from point of beginning; thence southerly 252.6 feet along said section line, thence westerly 296.3 feet, thence northerly 209 feet, thence easterly 300 feet to point of beginning, containing about 1.5 acres, and being a part of lot one of said section lying north of the city of North Muskegon, Michigan"—

and filed the bill of complaint herein to restrain and enjoin defendants from entering upon the premises and building a roadway across the same. From a decree for plaintiff, defendants appeal.

The controversy arises over the ownership and possession of the premises above described claimed by plaintiff. Bear lake, according to the government survey made in 1837, extends into the southeast quarter of section 12, township 10 north, range 17 west. It is a meandered lake. The southeast

quarter of section 12 was divided into lots 1 and 2. Lot 2 is the west fractional half of the southeast quarter of section 12. Lot 1 is the east fractional half of the southeast quarter of section 12, and, according to the United States survey, contained 66.15 acres of land. Bear lake, at the time this survey was made, was substantially coextensive with Bear lake as it now exists. Bear creek runs southwesterly through section 7, township 10 north, range 16 west, and lot 1 of section 12, township 10 north, range 17 west. After the lands in controversy had been surveyed, and the title thereto acquired from the government of the United States by private persons, the legislature of Michigan passed Act No. 96, Laws of 1840, which provided as follows:

"SECTION 1. *Be it enacted by the Senate and House of Representatives of the State of Michigan,* That Sheldon Judson, Lewis Nicholson, Nathan Judson and Benjamin Barnet, their heirs and assigns be, and they are hereby authorized and empowered to build a dam across the outlet of Bear lake, near its intersection with Lake Muskegon, on the northwest quarter of section number twenty-three, in township number ten north, of range number seventeen west, in the county of Ottawa: *Provided,* That said dam shall not exceed eight feet above the common low water mark."

About the time this act was passed, a dam was built at the outlet of Bear lake, as a result of which the marshy land along Bear creek in a northeasterly direction across lot 1 of section 12, town 10 north, range 17 west, and section 7 of township 10 north, range 16 west, was overflowed, nearly, if not quite to the easterly boundary of section 7. Bear lake likewise spread out and covered considerable land which naturally was not covered by the waters of

the lake. In 1881 the village of North Muskegon was incorporated and its boundaries fixed, as follows:

"Commencing at the point on the section line between sections seven and eight, in the township of Muskegon, where the quarter line running east and west intersects the same; thence west on said quarter line to the center of Bear lake; thence along the center of Bear lake to the section line, dividing sections fourteen and twenty-three, in the township of Laketon, said county; thence west along said section line to the northwest corner of said section twenty-three; thence south to the center of Muskegon lake; thence in a northeasterly direction to the southeast corner of said section seven and thence north to the place of beginning, be and the same is hereby constituted a village corporate under the name of the village of North Muskegon." Section 1 of Act No. 359, Local Acts of 1881.

In October, 1881, a plat of the village of North Muskegon, referred to as Smalley's map, was made and recorded as the official map of the village of North Muskegon. By that map, block 21 ran along the waters of Bear lake covering lands of lot 1 in the southeast fractional quarter of section 12, south of Bear lake as it then existed, and also the lands within the boundaries of the village above described on section 7 above mentioned.

The Cohasset Lumber Company at this time owned all of lot 1 of section 12, township 10 north, range 17 west. In 1883 the dam at the lower end of Bear lake went out, and the lake resumed its normal level. April 28, 1887, the Cohasset Lumber Company deeded to George R. Kinsman all that part of lot 1, section 12, town 10 north, range 17 west, lying north of the limits of the village of North Muskegon. Under no construction of this conveyance can it be

considered as covering any part of the lands in question. It conveys only land north of the quarter line running east and west through section 12.

In 1891 the city of North Muskegon was incorporated and its boundaries fixed, as follows:

"Commencing at a point where the southeast corner of fractional lot three of section eight, township ten north, of range sixteen west, Muskegon county, Michigan, intersects the shore line of Muskegon lake, running thence north on the line between lots two and three of said section to the quarter line thereof, thence west along the quarter lines of sections eight and seven of said township to the center of Bear lake, thence along the center of Bear lake to the section line dividing sections fourteen and twenty-three in the township of Laketon, said county, thence west along said section line to the northwest corner of said section twenty-three, thence south to the center of Muskegon lake, thence northeasterly along the center of Muskegon lake to a point where the section line between sections seven and eight in township ten north, of range sixteen west, would, if extended south, cross the bridge over Muskegon lake as now established, thence in a straight line to the place of beginning, including all lands in said boundaries and the portion of Bear lake and Muskegon lake (including) included therein, be and is hereby set off from the township of Muskegon and township of Laketon in said county." Section 1, chap. 1, Act No. 215, Local Acts 1891.

June 30, 1900, the Cohasset Lumber Company deeded, by two separate quitclaim deeds, to Charles H. Hackley and Thomas Hume, composing the firm of Hackley & Hume, a large amount of real estate, including all of blocks 20, 21, 23, 24, and 25 of the village of North Muskegon, and the unplatted part of the southwest quarter of southwest quarter of

section 7, town 10 north, range 16 west, and all of the northeast quarter of southwest quarter of section 7, town 10 north, range 16 west.

March 4, 1905, George R. Kinsman and wife deeded to Charles Gilbert and wife all of lot 1 of section 12, township 10 north, range 17 west, lying north of the city of North Muskegon.

June 1, 1895, by Act No. 466, Local Acts 1895, given immediate effect by the legislature, the city of North Muskegon was reincorporated and its boundaries fixed as follows:

"Commencing at the southwest corner of section eight of town ten north, range sixteen west, Muskegon county, State of Michigan; thence east to intersection of quarter line between fractional lots two and three of said section eight; thence north on said quarter line to the east and west quarter line through section eight and seven to the intersection of said quarter line with the west north and south eighth line of said section seven; thence south along said west eighth line to the south east and west eighth line of said section; thence along said last mentioned eighth line and due west to the center of Bear lake; thence along the center of Bear lake to the section line dividing sections fourteen and twenty-three; thence west along said section line to the northwest corner of said section twenty-three; thence south to the center of Muskegon lake; thence northeasterly along the center of Muskegon lake to the Allegan, Muskegon and Whitehall State road as now established; thence along the southwesterly side of said State road and in a northwesterly direction to the intersection of the section line between sections seven and eighteen of town ten north, of range sixteen west; thence east on said section line to the place of beginning, including all lands in said boundaries and the portion of Bear lake and Muskegon lake included therein, be and is hereby set

off from the township of Muskegon and township of Laketon in said county, and declared to be a city by the name of the city of North Muskegon, by which name it shall hereafter be known. And all that portion, piece or parcel of land included in the former city limits of the city of North Muskegon, and not included within the city limits as established by this act, is hereby detached from said city; and that portion so detached being parts of sections seventeen and eighteen of town ten north, of range seventeen west, is hereby added to and made a part of the township of Muskegon, Muskegon county; and that portion so detached. being part of section seven of said town ten north, of range seventeen west, is hereby added to and made a part of the township of Laketon, Muskegon county.'' Section 1, Act No. 466, Local Acts 1895.

At this time, as in 1891, when the city of North Muskegon was originally incorporated, Bear lake had already assumed its natural size. The ambiguity in the description of the northern boundary of the city of North Muskegon in the act of 1891 was obvious, and the act of 1895 was passed to remedy this description. By this act, the northern boundary of the city of North Muskegon was moved south a quarter of a mile, and, for the first time after the waters of Bear lake subsided, the lands in question here were outside of the north line of the city of North Muskegon. March 4, 1901, Charles H. Hackley and wife and Thomas Hume and wife sold to Joseph H. Metcalf the lands described as follows:

"All of block 21 together with the riparian rights incident thereto, and also that part of block 24 lying west of the Whitehall State road, all in Torrent and Arms enlarged and corrected map of the said city of North Muskegon, prepared by C. S. Gamble, April 1, 1900. Said premises are intended to com-

prise all that parcel of land commencing at the intersection of Center street with Cedar street in said city and running thence along the center of Center street in a northwesterly direction to the boundary line of the city of North Muskegon or so far as the riparian rights incident to said block 21 extend for the westerly boundary line. Commencing again at the intersection of Center street with Cedar street, and running in a northeasterly direction along the center of Cedar street to the corner of Douglas street, thence along the center of Douglas street to the westerly side of the Whitehall road, thence in a northerly direction to the thread of the stream of Bear creek, or so far as the riparian rights of the aforesaid blocks 21 and 24 extend on the westerly side of said Whitehall road, subject to all rights of the public in said waters on said land.''

August 4, 1897, the auditor general sold to Joseph H. Metcalf lot 21 of the city of North Muskegon for the taxes of 1893. December 28, 1908, Charles Gilbert and wife deeded to Hans T. Myer and wife, the lands described as all that part of lot 1, section 12, town 10 north, range 17 west, lying north of the city of North Muskegon, containing 35 acres more or less. June 28, 1920, Hans T. Myer and wife sold and conveyed to Jacob Koning, all that part of lot 1 lying north of the city of North Muskegon, section 12, town 10 north, range 17 west, without any limitation as to acreage. September 11, 1928, Jacob Koning and wife sold and conveyed to Harm Doctor the lands and premises described in the bill of complaint, and April 6, 1929, Harm Doctor sold and conveyed the same to plaintiff.

It is obvious that plaintiff's grantors had no title or color of title to the land in controversy under any conveyances prior to June 1, 1905, when the northern boundary of the city of North Muskegon

was, by act of the legislature, moved south to the south eighth line running east and west through section 12. Lot 1 of section 12, town 10 north, range 17 west, contained, according to the government survey, 66.15 acres. When Charles Gilbert and wife deeded to Hans T. Myer, December 28, 1908, they conveyed by description which would obviously cover the land in dispute, but described the land as containing 35 acres more or less, which would be approximately the amount of land lying north of the northerly limits of the village of North Muskegon, as originally incorporated, as well as the northerly limits of the city of North Muskegon as originally incorporated.

The plaintiff is in actual possession of the lands and premises in dispute. Since 1905 the conveyances in her chain of title cover the lands and premises in question. They lie immediately north of the northern boundary of the city of North Muskegon as fixed by the act of 1895. Defendants claim the right to enter upon the lands and premises in dispute under a lease from Joseph H. Metcalf, who, it is claimed, obtained title to the land in question by the conveyance above mentioned from Charles H. Hackley and wife and Thomas Hume and wife to him.

Several of the persons through whom plaintiff claims title were sworn as witnesses and testified to cutting hay south of Bear creek during their period of occupancy, and permitting others to cut hay thereon. The plaintiff sought to, and did, introduce in evidence testimony of declarations made by the persons claiming to have been owners and in possession of the lands and premises in controversy, tending to show they claimed title down to the northern boundary of the city of North Muskegon as fixed by

the legislative act of 1895. This testimony was all taken subject to defendants' objection against its competency. The defendants here insist such testimony was wholly incompetent. Without such testimony the plaintiff has no case.

The defendants rely upon *Jeffries* v. *Union Trust Co.*, 248 Mich. 652, where this court affirmed a holding by the trial court that the testimony of plaintiff as to what her grantor told her of the boundary of the property at the time she purchased it was inadmissible. No authorities are cited in support of this holding.

Greenleaf says:

"No reason is perceived why every declaration accompanying the act of possession, whether in disparagement of the claimant's title, or otherwise qualifying his possession, if made in good faith, should not be received as part of the *res gestæ.*" Greenleaf on Evidence (15th Ed.), § 109.

Elliott says such declarations are only admissible to show the character of the possession. Elliott on Evidence, § 555.

"Such declarations are competent only to show the character of the possession of the person making them, and by what title he holds, but not to sustain or to destroy the record title. The better view is that such declarations, when made in good faith by persons who are at the time in possession of land or tenements, are verbal acts, which may be admitted for the purpose of showing the character of the possession, whether they are in disparagement of the declarant's title or otherwise." Jones Commentaries on Evidence (1st Ed.), § 352.

Wigmore says:

"It is sufficient here to say that the principle is today fully and universally conceded." 2 Wigmore on Evidence (2d Ed.), § 1082.

In *Bower* v. *Earl*, 18 Mich. 367, this court said:

"We agree with Mr. Greenleaf that such statements and claims to explain possession are admissible for what they are worth, whether in disparagement of title or not."

In *Cook* v. *Knowles*, 38 Mich. 316, the case of *Bower* v. *Earl, supra*, was commented upon. It is said:

"The action was ejectment, and we held that statements made by a former grantor of one of the parties, while in possession, concerning the extent of his holding and the place of the dividing line between him and an adjoining proprietor, were competent to explain the nature and extent of his possession, and we expressly approved the doctrine stated by Mr. Greenleaf."

"The intention with which possession is held constitutes the very essence of adverse possession, and the assertion of the occupant with reference to the nature of his possession is competent evidence to prove intent." *Youngs* v. *Cunningham*, 57 Mich. 153.

We think, notwithstanding defendants' objection to the introduction of this testimony, it was competent and admissible. We think *Jeffries* v. *Union Trust Co., supra*, was not intended to overrule the authorities above cited.

Defendants' lessor is not a party to this suit. He has record title to the land in controversy. Plaintiff's claim of title is based upon the deeds abovementioned purporting to convey color of title to the premises and upon the claim of adverse possession. Plaintiff's adverse possession is based upon evidence of alleged adverse possession by her and her *mesne* grantors for the statutory period. The only evidence of such adverse possession is the cutting of

hay from the premises by some of such grantors some years and permitting others to do so. The premises in controversy, until recently, were comparatively worthless, unfenced, uncultivated, unproductive, unimproved marsh land. For more than 40 years they were submerged by the waters of Bear lake after the construction of the dam at its outlet. There is no evidence that after the recession of the waters of Bear lake, in 1883, the premises in question were fenced, improved, or cultivated up to within the statutory period necessary for adverse possession.

It is well settled that the constructive possession of land is in the holder of the record title, that a mere claim of title, no matter how long asserted, will not ripen into title, that—

"The occasional or periodical entry upon land to cut wild grass is not an act manifesting a purpose to take possession as owner, and does not constitute actual possession." 2 C. J. p. 67.

See, also, *Dedenbach* v. *Talbot,* 244 Mich. 140.

"In order to make good a claim of title by adverse holding the true owner must have actual knowledge of the hostile claim, or the possession must be so open, visible, and notorious as to raise the presumption of notice to the world that the right of the true owner is invaded intentionally and with a purpose to assert a claim of title adversely to his, or so patent that the owner could not be deceived, and such that if he remains in ignorance it is his own fault." 2 C. J. pp. 75, 76.

See, also, *Chabert* v. *Russell,* 109 Mich. 571; *Dedenbach* v. *Talbot, supra.*

"There must be such continuity of possession as will furnish a cause of action for every day during the whole period required to perfect title by ad-

verse possession; and the possession must be more than a possession which will enable a person, on the ground of possessory title, to maintain trespass or ejectment against a stranger. Hence occasional trespasses or acts of ownership do not constitute such continuous possession as will ripen into a title by adverse possession, although extending over the statutory period, and a mere claim of ownership does not of itself amount to a continuation of possession so as to support a title by adverse possession.'' 2 C. J. p. 82.

Such hay cutting as occurred was casual, amounting to but little more than an annual trespass (*Dedenbach* v. *Talbot, supra*), and was not sufficient to warn the owner of the record title that plaintiff's grantors or any of them were claiming to be in the actual, continuous, open, notorious, hostile, and adverse possession of the premises in dispute.

Plaintiff has failed to make out a case of title by adverse possession against defendants' lessor, not made a party to this suit. The decree of the trial court is reversed, and the bill of complaint dismissed, with costs.

WIEST, C. J., and BUTZEL, CLARK, McDONALD, SHARPE, NORTH, and FEAD, JJ., concurred.