ROZMAREK v PLAMONDON

Docket No. 70603. Decided July 23, 1984. On application by the plaintiffs for leave to appeal, the Supreme Court, in lieu of granting leave to appeal, reversed the judgment of the Court of Appeals and remanded the case to the trial court for further proceedings. Rehearing denied *post*, 1214.

Henry Rozmarek and Violet Rozmarek brought an action in the Manistee Circuit Court against Luke Plamondon and Virginia Plamondon, seeking a determination that they had become owners by adverse possession of a certain lot of real property claimed by the Plamondons as owners of record. The court, Charles A. Wickens, J., found the Rozmareks to be the owners of the lot by adverse possession, free from claims of any other persons including the Plamondons. The Court of Appeals, R. B. Burns and Gillespie, JJ. (D. F. Walsh, P.J., dissenting) reversed in an unpublished opinion per curiam, holding that the Rozmareks had not given the Plamondons or their predecessor in title notice of the claim, that their attempt to purchase the property from the defendants was inconsistent with the claim, and that their possession was not exclusive (Docket No. 54292). The plaintiffs apply for leave to appeal.

In a unanimous opinion per curiam, the Supreme Court *held:*

1. There was substantial evidence that the plaintiffs maintained actual, visible, open, notorious, exclusive, continuous, and uninterrupted possession of the property at issue for at least 15 years as well as substantial evidence that they did not. The trial court listened to the proofs, observed the witnesses, and found for the plaintiffs. It was error to set aside those findings on appeal.

2. The plaintiffs' offers to purchase the parcel were not admissions that their claim was flawed. The offers were made well after they had gained title by adverse possession. There is nothing inherently incompatible between a claim of right in real property and attempts to clear the record title.

3. Because a part of the lot in question was used by a railroad and thus was never adversely possessed by the plaintiffs, the case must be remanded to the trial court for a

determination of exactly what part of the lot belongs to the plaintiffs.

Reversed and remanded.

*Krolczyk & Danielson* (by *Brent Danielson*) for the plaintiff.

*O'Toole, Stevens, Johnson, Knowlton, Potter & Rolf* (by *Foster D. Potter*) for the defendant.

PER CURIAM. This is an adverse possession case. We face two issues: whether the plaintiffs' possession of the disputed property was sufficiently open and notorious, and whether the plaintiffs' claim of adverse possession is defeated by the fact that a portion of the disputed property clearly remained under the control of the defendants' predecessor in title during the years in question.

I

In 1946, the plaintiffs purchased lot 20 of Engelmann's Addition to the City of Manistee. This case concerns the adjacent lot 21. Lots 21 and 22 were owned by the Olson family, which operated a lumber company not far away. A spur rail line serving the lumber company and other enterprises crossed a portion of lot 21 and 22. After the spur was discontinued in 1976, the plaintiffs attempted to purchase lot 21 from the Olson family and, after the Olsons instead sold to the defendants, the plaintiffs attempted to purchase lot 21 from the defendants. Unable to purchase lot 21, the plaintiffs filed a complaint on October 3, 1979, in Manistee Circuit Court, seeking a determination that they had become the owners of lot 21 through adverse possession.

The trial testimony was contradictory. Plaintiff Henry C. Rozmarek testified to having performed

a considerable number of activities on lot 21 over the years. He said he cut trees there in 1946, stored construction materials from 1946 through 1949, filled in a portion of the lot for his own benefit in 1950, hired a person to rototill in 1951 and 1952, gardened on the lot from 1952 or 1953 to the present, planted grass in 1952 (and fertilized, watered, and cut it thereafter), parked cars on the lot daily in 1950, planted trees in the 1960's, put up a birdhouse in 1950 or 1951, had a cutaway put in the curb and gutter, placed various decorative trees and bushes on the property, plowed a parking space, excluded persons from using the lot, used a TV antenna as an obstacle to prevent others from crossing the lot, cut the grass "to where you could possibly use it as a golf course" through 1979, and engaged in other personal uses of lot 21. His daughter testified that a garden had been planted on lot 21, that there had been exclusion of others, that there had been mowing of grass and planting of trees, and that it was "a normal thing" to park a car on lot 21. Two sons testified in the same vein.

The defense testimony was altogether different. Defendant Luke Plamondon and others testified that lot 21 was not landscaped during the 1950's, that there was no exclusion of others from lot 21, and that, generally, there were no observable signs that the plaintiffs were attempting to exert dominion over lot 21.

## II

In its opinion, the Manistee Circuit Court found that the plaintiffs had used lot 21 in a variety of ways for many years:

"This is an action for adverse possession of a parcel of

land described as Lot 21, Engelmann's Addition to the
City of Manistee, according to the recorded plat. The
facts show that the plaintiff bought adjoining Lot 20,
which lies immediately west of Lot 21. Plaintiff pur-
chased his property, Lot 20, in 1946. He did not have
the property surveyed, and he did not know where his
east boundary line was. The plaintiff, upon purchase,
placed a basement on Lot 20, which was a lot with a
depression in it. After completing the foundation in
1946, he hauled in dirt and filled in around his founda-
tion on Lot 20, and filled in approximately two-thirds of
Lot 21. At the time of these actions, he did not know
where his east boundary line was, but proceeded to fill
the property and occupy it as his own under an assump-
tion that he owned at least a portion of Lot 21.

"Lot 21 is sixty feet wide, and was never surveyed or
had any indications as to its boundaries by the owners
thereof. At the time the plaintiff filled in Lot 21, Lot 21
and some other adjoining vacant lots were owned by
the Olson Lumber Company. Olson Lumber Company
never used these lots in the operation of their business,
their principal activity being approximately a block
away. The filling in of the lots in 1946 was apparent to
all of the parties and people living in the area. The
Olson Lumber Company made no objections to the
filling in of the lot or its occupancy by the plaintiffs.

"Subsequently thereafter the plaintiffs had the lot
leveled off, black dirt hauled in upon the property, and
turned it into a yard. The plaintiffs then stored building
materials upon the property while they were construct-
ing their home on Lot 20. After the plaintiffs had
started a lawn on Lot 21, they also put in a garden in
the early fifties and started planting trees, including
ornamental and fruit trees. The number is uncertain,
but may be twenty-five or so in number. The plaintiffs
then placed a hedge of flowers upon the property,
placed a birdhouse on the property, and have main-
tained the property as part of their yard since approxi-
mately 1950. They have used it for a parking place for
their automobiles, have mowed the yard, and have
constructed a fence across the back portion of the yard
using a TV antenna, to prevent people from crossing
the lot.

"Over the years, although the plaintiff was not sure as to where his property line was on the east side, he claimed this property as his own based upon the improvements that he made, and kept all persons off of the property other than invitees who came to play with his children, or for picnics. No one objected to the plaintiffs exercising ownership of the property. They ejected rowdy persons from the property, and other persons who carried on acts detrimental to their lawn and garden, and did all of this for the required fifteen-year period for adverse possession. The Olson Lumber Company acquiesced in the plaintiffs' actions, never asserted a claim of right, and, beginning with the placing of the large amount of dirt and leveling off of the property in 1946, the plaintiffs' title would be ripened into adverse possession fifteen years thereafter. The recitation by the court of the above facts are not in limitation, but only examples of the proofs which include pictures and testimony that show that the plaintiff claimed this property for fifteen years after the spring of 1946, by the fact that they had possessed the property actually, openly, visibly, notoriously, exclusively, and continuously for an uninterrupted period of fifteen years."

The circuit court noted that the plaintiffs had attempted to purchase lot 21, but explained its view that these negotiations did not divest the plaintiffs of title:

"After the defendants had purchased their land from the Olson Lumber Company, arguments, accusations, and negotiations took place to resolve the question of the disputed title of Lot 21. These arguments and negotiations did not divest the plaintiffs from legal title to Lot 21, which they had established for many years. These arguments and negotiations were an attempt to resolve the dispute that existed without a lawsuit. These arguments and negotiations broke down, and the plaintiffs filed this lawsuit to have the court declare them the owners of Lot 21 according to the facts of adverse possession. The negotiations in this case and

statements made during negotiations were not a denial by the plaintiffs of their adverse title, but merely statements by a layman in attempting to resolve the issue without the help of the court."

In the light of this opinion, the circuit court entered a judgment providing that the plaintiffs, by virtue of their adverse possession of lot 21, were the owners of that lot, free from the claims of any other person, including the defendants.

## III

The Court of Appeals reversed the judgment of the circuit court.[1] The majority of the Court of Appeals panel found that the plaintiffs had not given Olson or the defendants actual notice of their claim. The Court of Appeals majority took note of the plaintiffs' attempt to purchase the property and further stated that the "operation of the railroad would destroy any claim of exclusivity":

"The evidence offered in support of adverse possession must be strictly construed with every presumption being exercised in favor of the record owner of the land. The plaintiff must enter under his deed, and his possession is only coextensive with his title and is restricted by the premises described in his deed. *Sheldon v Michigan C R Co,* 161 Mich 503, 512; 126 NW 1056 (1910); *Comforto v Skirke,* 289 Mich 707, 710; 287 NW 353 (1939). Under the circumstances of this case, the statutory period to obtain title by adverse possession was 15 years. MCL 600.5801(4); MSA 27A.5801(4). During that 15 years, the plaintiff must have had actual, visible, open, notorious, exclusive, uninterrupted possession, hostile to the owner and under cover of claim of right. *Burns v Foster,* 348 Mich 8, 14; 81 NW2d 386 (1957).

[1] Unpublished opinion per curiam of the Court of Appeals decided November 5, 1982 (Docket No. 54292).

"It is well settled that in order to establish adverse possession, the true owner must have actual knowledge of the adverse possession, or alternatively, the possession must be so notorious as to raise the presumption to the world that the possessor claims ownership. *McVannel v Pure Oil Co*, 262 Mich 518, 525-526; 247 NW 735 (1933); *Ennis v Stanley*, 346 Mich 296, 301; 78 NW2d 114 (1956).

"The plaintiffs, until suit was brought, did not give Mr. Olson or the defendants, who were the record owners, actual notice of their claim. Conversely, Mr. Rozmarek actually approached Mr. Olson to buy the property in 1976. Mr. Olson testified that he was unaware of any claim of adverse possession by the plaintiffs. Mr. Rozmarek, shortly before filing suit, also approached Mr. Plamondon to attempt to buy the property.

"Two neighbors testified that they observed the use of the property and neither of them assumed from the use that plaintiffs owned the property. Other neighbors testified that they viewed the property as vacant property.

"Under these conditions, the record owner had neither actual nor constructive notice of plaintiffs' claim.

"The trial court found that the location of the east boundary was not known to the parties. It is a well-recognized rule that possession of property under a mistake as to the boundary is not hostile and does not ripen into title. *Ennis v Stanley, supra,* p 305. *Wood v Denton,* 53 Mich App 435, 440-441; 219 NW2d 798 (1974).

"It is undisputed that Olson or the defendant paid the taxes on lot 21 at all times from 1928 forward. The payment of taxes is not conclusive, but is an important element in determination of title by adverse possession. *Bachus v West Traverse Twp,* [107 Mich App 743, 748; 310 NW2d 1 (1981)]; *Burns v Foster, supra,* p 15; *Monroe v Rawlings,* 331 Mich 49, 51; 49 NW2d 55 (1951).

"It is also undisputed that an active railroad spur crossed over a part of the property until 1976. This railroad spur was being used for the owners' purposes.

The operation of the railroad would destroy any claim of exclusivity.

"Under Michigan law, the presumptions are in favor of the record owners. One who alleges adverse possession bears a heavy burden to upset a title of record which is supported by consideration. Occasional trespass, concurrent possession with the owner, claim of title not communicated actually or constructively to the owner, peaceful occupation, possession with acquiescence or permission of the owner will not support adverse possession.

"The factors mentioned here by us are admitted and undisputed. We conclude that plaintiffs did not meet the heavy burden of proof required to succeed in their claim of adverse possession against the record owners."

In a dissent, Judge WALSH opined that, with one modification, he would affirm the judgment of the circuit court:

"The trial court found that the 15-year statutory period began to run in 1946, when plaintiffs purchased the adjoining lot. Accordingly, plaintiffs' title by adverse possession ripened in 1961. Defendants' claim that plaintiffs' attempts to buy the property from the record owner in 1977 and 1978 were inconsistent with the 'claim of right' element of adverse possession is incorrect. Plaintiffs' offers to purchase the property were made well after they had gained title by adverse possession. In any event, there is nothing inherently incompatible between a claim of right in real property and efforts to clear the record title thereto. *Munroe v Pere Marquette R Co*, 226 Mich 158, 164; 197 NW 566 (1924); *Gardner v Gardner*, 257 Mich 172, 177; 241 NW 179 (1932); *Olson v Nordan*, 6 Mich App 132, 138; 148 NW2d 528 (1967).

"In one respect, however, the lower court misapplied the doctrine of adverse possession—in particular, the claim of right requirement. Because plaintiffs did not claim under color of title, they could acquire title by adverse possession only to the land actually possessed

by them. *McVannel v Pure Oil Co,* 262 Mich 518, 523-524; 247 NW 735 (1933).

" 'Though it is not necessary for defendants to have the record title to the land in question in order to acquire title by adverse possession, *Lawson v Bishop,* 212 Mich 691 [180 NW 596 (1920)]; *McVannel v Pure Oil Co, supra,* the constructive possession of the land in question is in the title owner and there can be no constructive possession of lands in one who has no record title. Title by adverse possession, in the absence of color of title, can extend no farther than the boundaries of that land which is actually used and occupied for the statutory period by those claiming title by adverse possession. They can acquire nothing beyond that which is actually possessed, used, controlled and occupied by them for the statutory period.' *Bankers Trust Co v Robinson,* 280 Mich 458, 463; 273 NW 768 (1937).

"In this case, the trial court ruled that plaintiffs had acquired title to lot 21 in its entirety. There was uncontroverted evidence, however, that at least a portion of the lot—*i.e.,* the land on which a railroad track was located—was never occupied by plaintiffs. I would remand to the lower court, therefore, for a determination of the exact dimensions of lot 21 which were actually possessed, used, controlled and occupied by plaintiffs for the entire statutory period.

"After reviewing the record, I am persuaded that there was sufficient evidence which, if believed, supported the remaining findings of the lower court. I conclude that the court's findings, with the sole exception discussed, were not clearly erroneous."

## IV

We agree with Judge WALSH. On the central issue whether the plaintiffs have adequately demonstrated adverse possession of lot 21, the testimony was completely divided. There was substantial evidence that the plaintiffs maintained actual, visible, open, notorious, exclusive, continuous and uninterrupted possession for the statutory period

of 15 years.[2] *Burns v Foster, supra; Hart v Detroit,* 416 Mich 488, 497; 331 NW2d 438 (1982). There was also substantial evidence that they did not. The Manistee circuit judge listened to the proofs, observed the witnesses, and found for the plaintiffs. There being ample evidence on both sides of this question, it was error for the Court of Appeals to set aside the findings of the circuit court on this issue.

We further agree with Judge WALSH, for the reasons stated in his dissenting opinion, that the plaintiffs' offer to purchase peace was not an admission that their claim was flawed and that the circuit court erred in awarding to the plaintiffs title over the entire portion of lot 21. Since it is undisputed that at least the portion used for railway purposes was never adversely possessed by the plaintiffs, we agree that this case should be remanded to the circuit court for a determination of exactly what portion of lot 21 belongs to the plaintiffs.

In lieu of granting leave to appeal, we reverse the judgment of the Court of Appeals and remand this case to the circuit court for such proceedings as are necessary to determine exactly what portion of lot 21 belongs to the plaintiffs. GCR 1963, 853.2(4). In light of this disposition, it is unnecessary to consider the plaintiffs' other issue on appeal. We do not retain jurisdiction.

WILLIAMS, C.J., and KAVANAGH, LEVIN, RYAN, BRICKLEY, CAVANAGH, and BOYLE, JJ., concurred.

[2] MCL 600.5801(4); MSA 27A.5801(4).