# STATE OF MICHIGAN

# COURT OF APPEALS

LORI EDINGER-FOWLER, RICK HAMILTON, BRENT GOINGS, and SUSAN GOINGS,

Plaintiffs-Appellants,

v

HARRY KEZELIAN and PATRICIA KEZELIAN,

Defendants-Appellees.

UNPUBLISHED
October 23, 2018

No. 339164
Livingston Circuit Court
LC No. 16-028878-CH

Before: RONAYNE KRAUSE, P.J., and GLEICHER and LETICA, JJ.

PER CURIAM.

Plaintiffs appeal by right the trial court's order denying their motion for summary disposition and granting defendants' cross-motion for summary disposition. This case involves an ownership dispute over a subdivision outlot that was reserved by the developer for future road purposes. The homeowners on either side of the outlot claimed ownership to a portion of the outlot through adverse possession or acquiescence, but the circuit court summarily dismissed their claims. We conclude that the homeowners on one side of the outlot (Lori Edinger-Fowler and Rick Hamilton) created questions of fact regarding ownership that precluded summary dismissal of their claims. Because those claims are now revived, the circuit court will also need to consider the outlot owners' claim to an easement by necessity to cross the outlot to access otherwise landlocked property beyond. We affirm in part, vacate in part, and remand for further proceedings.

## I. BACKGROUND

### A. FACTUAL HISTORY

At issue in this case is ownership of "Outlot A," which abuts a cul-de-sac at the end of Hartun Drive in the Deer Creek No. 2 subdivision in Brighton. Brent and Susan Goings were the first to construct a home on the cul-de-sac in 1996. They own Lot 37 on one side of Outlot A. Thomas and Marisa Anderson constructed their home in 1998 on Lot 85, on the other side of Outlot A. The Andersons sold Lot 85 to Lori Edinger-Fowler and Rick Hamilton (plaintiffs) in 2015. The following map illustrates this area:

-1-



The area including and surrounding the Deer Creek subdivisions was originally owned by the Kezelian family. When the Kezelians divided their land to sell to subdivision developers, they retained a large rectangular parcel to the north, containing the historic family farmhouse, wetlands, and woods. The subdivision developers reserved outlots in their plat maps to access areas on the Kezelians' reserved land in the event the Kezelians later sold the reserved land for development. The recorded plat map describes the parcel at issue in this case as "Outlot A for future road purposes." Wetlands on the Kezelians' property limit possible construction north of Outlot A—on "Parcel 6," marked as "unplatted" on the above map—and cut off any other means to access the site. Although the subdivision developer had previously owned Outlot A, the Kezelians repurchased ownership before this suit was initiated.

When the Goings bought their property, the developer's sales agent, John Weatherly, "made it clear that the outlot was there and it was owned by" the developer, Mitch Harris. Weatherly advised that "[t]here was a possibility of putting a future road" through Outlot A, but Weatherly "didn't see how [Parcel 6] could be built on" given the wetlands. Susan remembered Weatherly stating, "[T]here's potential to put one or two houses back there," and that the outlot "would be used to access back there," "more like a driveway with only two houses" at the end.

The Goings knew they did not own Outlot A. However, Harris had cleared and bulldozed a portion of Outlot A, "making [the Goings'] yard actually beyond the portion of the property line." The Goings hired a contractor to lay sod on a small part of Outlot A—on the front 20 to 25 feet, on the half closest to their property. They did this "for esthetics in the neighborhood." The Goings installed a sprinkler system on their own lot and purposely angled the sprinkler heads to water Outlot A as well. The Goings' children played in Outlot A, the

-2-

family kept the area mowed and fertilized, and they removed nuisance brush and weeds. The Goings' garden lay partly on Outlot A. Brent testified that he would not have invested so much into Outlot A's cultivation and maintenance had Weatherly told him that Parcel 6 would likely be built upon in the future. Susan indicated that if Weatherly had given them that information, they would not have purchased Lot 37, because they wanted to live on a cul-de-sac.

Thomas Anderson also testified that Weatherly advised him of Outlot A's existence and that it could be used in the future to "access" building sites on Parcel 6, although in Weatherly's opinion the chance was slim. Thomas claimed that "nobody ever said anything" about the type of access, leading him to believe it could be "a road, a trail, a walkway, I don't know." He also did not know that Outlot A was the only means to access Parcel 6. Marisa Anderson believed Parcel 6 "was non-buildable because it was wetlands and it was protected."

Thomas noted that survey stakes were in place during construction of the Anderson home and that he later learned they were too far over, actually on Outlot A. At the time, however, Thomas relied on the stakes when he contracted to have his driveway poured and to have a mailbox and shrubbery installed on the driveway's far side. As a consequence of that reliance, his driveway would meet any new road placed on Outlot A in an inconvenient manner, and the mailbox and shrubbery are almost completely on Outlot A. The Andersons sodded the front 20 to 25 feet of Outlot A closest to their property, sprinkled grass seed in the back, and planted a line of small pine trees on the outlot. The Andersons also had a sprinkler system installed, including on the far side of their driveway. The Andersons used these sprinklers, as well as other methods, to keep Outlot A watered. The Andersons paid the Goings' children to mow Outlot A and their yard, and the Andersons assisted in keeping Outlot A free of fallen trees, limbs, and weeds. They did these tasks to beautify the neighborhood and because "it would have looked unkempt otherwise."

Harris claimed that "one of the neighbors asked" Weatherly for permission before laying sod and maintaining Outlot A. Unfortunately, Weatherly passed away in 2016, before he could be deposed. Neither the Goings nor the Andersons testified that they were the ones who had asked permission to alter Outlot A. Harris corroborated the Goings' and Andersons' recollections that they were advised that development on Parcel 6 was unlikely, noting "[t]here wasn't enough sites" to make a profit. Harris would not have been "surprise[d]" if Weatherly told the residents that Parcel 6 "will never be developed because it can't be developed . . . because of environmental issues and the wetland areas[.]" However, Harris could not recall if he personally had any discussions with the Goings or the Andersons about Outlot A.

Hamilton testified that he had no discussion with the Andersons about Outlot A and had no idea that it even existed until the Kezelians arrived with bulldozers, intending to push their way through to Parcel 6. Until that time, Hamilton had assumed his yard extended to the midway point of the area he later learned was Outlot A. The Kezelians had a survey conducted and stakes were laid along the boundaries of Outlot A. Hamilton noted that the stakes went between his driveway and mailbox: "[T]he first stake [was] inches from where [plaintiffs'] driveway is." Because Thomas installed sprinklers on the far side of the driveway and Hamilton noted that sprinkler heads were found "in the wooded area, up to and around the front of the mailbox," several sprinkler heads were actually located on Outlot A. Hamilton continued the Andersons's practice of paying the Goings' youngest son to mow on Outlot A and personally

-3-

removing weeds and fallen trees from the area. Plaintiffs also removed some shrubs around the mailbox where bees had built hives. Hamilton believed they "paid a premium" for their house because it was located on a cul-de-sac.

Edinger-Fowler also claimed not to know of Outlot A's existence at the time of purchase. She assumed plaintiffs and the Goings shared a property line in the middle of that area. Moreover, Edinger-Fowler asserted, "I wouldn't have bought the house if I knew there was an out lot." Plaintiffs' real estate agent did not mention the outlot when she walked "the property line" with plaintiffs. The agent merely noted, "[I]t's a perfect setting. It's very private." However, plaintiffs signed a survey waiver as part of the purchase transaction, indicating that "[f]acts that would be disclosed by an accurate survey of the subject property" would be excepted from the title insurance policy coverage.

## B. PROCEDURAL HISTORY

Ultimately, plaintiffs filed suit against the Kezelians to quiet title to Outlot A on theories of adverse possession and acquiescence. They later added the Goings as necessary party plaintiffs. The parties filed competing motions for summary disposition under MCR 2.116(C)(10). The circuit court ruled in the Kezelians' favor and dismissed plaintiffs' and the Goings' action. The court observed that the recorded plat map "clearly" designated Outlot A "for a future roadway." The Kezelians own Parcel 6 and did the acts necessary to reserve their right to access in drafting the plat, the court continued. Given the plat map, plaintiffs and the Goings "took that property knowing that they each were going to border on land reserve[d] [for] future road purposes."

Furthermore, the court was unimpressed with plaintiffs' and the Goings' maintenance of Outlot A. Plaintiffs simply did not "want to border on . . . wild or natural property." "[T]he true owner [was] neighborly enough not to tell them to leave his property alone," the court noted, but the court did not "think that the [Kezelians and Harris] ought to be punished for not barking at [their] neighbors and telling him not to cut that grass." The failure to complain did not negate the designation of Outlot A in the plat map in the court's estimation. The court took notice that residential development had waned in the area, especially after the recession of 2008, before more recently rebounding. The court found the timing of potential building on Parcel 6 to be "of no consequence"; the owners could develop the backlot "as they see fit and as they have over the years." "Just because land lays [vacant] doesn't mean you lose it." The court noted other questions that might have been helpful in answering the ownership question, such as who paid the taxes on Outlot A. Despite these unanswered questions, the court found that summary disposition was appropriate in the Kezelians' favor.

## II. STANDARD OF REVIEW

We review de novo a lower court's decision on a summary disposition motion. *Maiden v Rozwood*, 461 Mich 109, 118; 597 NW2d 817 (1999).

A motion under MCR 2.116(C)(10) "tests the factual support of a plaintiff's claim." *Walsh v Taylor*, 263 Mich App 618, 621; 689 NW2d 506 (2004). "Summary disposition is appropriate under MCR 2.116(C)(10) if there is

no genuine issue regarding any material fact and the moving party is entitled to judgment as a matter of law." *West v Gen Motors Corp*, 469 Mich 177, 183; 665 NW2d 468 (2003). "In reviewing a motion under MCR 2.116(C)(10), this Court considers the pleadings, admissions, affidavits, and other relevant documentary evidence of record in the light most favorable to the nonmoving party to determine whether any genuine issue of material fact exists to warrant a trial." *Walsh*, 263 Mich App at 621. "A genuine issue of material fact exists when the record, giving the benefit of reasonable doubt to the opposing party, leaves open an issue upon which reasonable minds might differ." *West*, 469 Mich at 183. [*Zaher v Miotke*, 300 Mich App 132, 139-140; 832 NW2d 266 (2013).]

Actions to quiet title are equitable in nature, and if the trial court had held a bench trial, we would have reviewed its legal conclusions de novo and its factual findings for clear error. *Jonkers v Summit Twp*, 278 Mich App 263, 265; 747 NW2d 901 (2008). However, at a summary disposition stage of proceedings, "the court may not resolve factual disputes or determine credibility." *Burkhardt v Bailey*, 260 Mich App 636, 646-647; 680 NW2d 453 (2004).

III. ADVERSE POSSESSION

Plaintiffs and the Goings claim title to at least some portion of Outlot A through adverse possession. We affirm as to the Goings, but we vacate as to plaintiffs.

A. ELEMENTS

To acquire title to land by adverse possession, the invader "must have had actual, visible, open, notorious, exclusive, uninterrupted possession, hostile to the owner and under cover of claim of right" for a period of 15 years. MCL 600.5801(4); *Rozmarek v Plamondon*, 419 Mich 287, 292; 351 NW2d 558 (1984) (cleaned up).[1] Hostility "is a term of art" referring to nonpermissive use of property inconsistent with the true owner's rights, not to any kind of ill will or maliciousness. *Wengel v Wengel*, 270 Mich App 86, 92-93; 714 NW2d 371 (2006). "Determination of what acts or uses are sufficient to constitute adverse possession depends upon the facts in each case and to a large extent upon the character of the premises." *Burns v Foster*, 348 Mich 8, 14; 81 NW2d 386 (1957). For example, it might be consistent with the character of the property that the property would only be used occasionally. See *Jonkers*, 278 Mich App at 273-274. Nonetheless, within that context, the would-be adverse possessor must act in such a way that the hostile use would be readily apparent to the true owner. See *Burns*, 348 Mich at 15. The true owner must have actual knowledge of the invader's use of the property, or that use must be readily discoverable by the true owner. See *Rozmarek*, 419 Mich at 293.

---

[1] This opinion uses the new parenthetical (cleaned up) to improve readability without altering the substance of the quotation. The parenthetical indicates that nonsubstantive clutter such as brackets, alterations, internal quotation marks, and unimportant citations have been omitted from the quotation. See Metzler, *Cleaning Up Quotations*, 18 J App Pract & Process 143 (2017).

The elements of adverse possession must be established by "clear and cogent evidence," which "is more than a preponderance of the evidence, approaching the level of proof beyond a reasonable doubt." *Walters v Snyder*, 225 Mich App 219, 223; 570 NW2d 301 (1997).

## B. ACTUAL, VISIBLE, OPEN AND NOTORIOUS FOR THE STATUTORY PERIOD

Most of the elements of adverse possession are obviously satisfied in this case. There can be no question that the Andersons', plaintiffs', and the Goings' use of Outlot A was perceptible by the Kezelians and their predecessors. The front portion of Outlot A went from rutted mud to manicured lawn with a mailbox and shrubbery at the curbside corner of Lot 85, and remained in that condition for more than 15 years. Indeed, neither the Kezelians nor the developer tried to enter the land until 2015. The land was used exclusively by the homeowners as part of their yards. The use was also uninterrupted. There was never a period when the homeowners stopped maintaining or abandoned the area. Consequently, the most salient question is whether the Andersons', plaintiffs', and the Goings' use was hostile to the owner and done with claim of right.

## C. HOSTILE TO THE TRUE OWNER

The Kezelians contend that the circuit court properly determined that plaintiffs' and the Goings' use of the property was de minimis only and did not rise to the level of hostility necessary to establish title by adverse possession. However, the Goings completely altered Outlot A after their purchase of Lot 37. The Goings hired a landscaping company to smooth the dirt left behind during construction on the front 20 to 25 feet of the outlot, to remove brush, and then to lay sod on the half of Outlot A closest to their property. The Andersons followed suit and hired a company to lay sod in the area. In the years that followed, the homeowners on both sides kept the area watered, fertilized, and otherwise maintained. It is likely that the Andersons' sprinkler system even crosses over onto the outlot. The mailbox and surrounding shrubbery installed by the Andersons also trespasses onto the outlot. The Goings' garden crossed into Outlot A as well.

These activities were more than occasional fly-overs with a lawnmower. In this regard, we find helpful a comparison to *Doctor v Turner*, 251 Mich 175; 231 NW 115 (1930). The land at issue in *Doctor* was submerged under Bear Lake after the installation of a dam. When the waters receded, the land was "comparatively worthless, unfenced, uncultivated, unproductive, unimproved marsh land." *Id*. at 185-186. The plaintiffs claimed adverse possession because they sometimes entered the land to cut hay or granted others permission to do so. This use was not regular, and did not even occur annually. *Id*. at 186. The Supreme Court determined that the plaintiffs had not acquired title by adverse possession because "[t]he occasional or periodical entry upon land to cut wild grass is not an act manifesting a purpose to take possession as owner, and does not constitute actual possession." *Id*. (quotation marks and citations omitted). The plaintiffs' entry on the land was so occasional that it "was not sufficient to warn the owner of the record title that" the plaintiffs were claiming title adversely. *Id*. at 187. In contrast, we conclude that plaintiffs and their predecessors and the Goings made such continuous use of the subject property as part of their yards that they did "manifest[] a purpose to take possession as owner."

## D. LACK OF PERMISSION

We find no possible question of fact that none of the property owners' use of Outlot A was permissive. A lack of permission is also a necessary element of hostility. See *Grand Rapids v Pere Marquette R Co*, 248 Mich 686, 690; 227 NW2d 797 (1929). Harris stated that *either* the Goings *or* the Andersons asked permission to sod and maintain Outlot A. The Goings and the Andersons both denied asking for permission, which would create a genuine question of fact. However, even taking Harris's testimony as given, permissive use cannot be shown. Specifically, there is no way to attribute more than a 50% possibility as to either the Goings or the Andersons: both are equal possibilities. Therefore, it is *impossible* to establish even by a mere preponderance of the evidence that any specific party asked for, and was granted, permission. As noted, each element must be proved by the higher standard of clear and convincing. *Walters*, 225 Mich App at 223.

Additionally, as we discussed above regarding hostility, we find the intrusions into Outlot A more than mere occasional neighborly maintenance. It is possible that if Neighbor A crosses onto Neighbor B's lawn and plants a flower bed, Neighbor A may be pleased to see this positive enhancement to his property. However, if Neighbor A maintains that flower bed for 15 years and Neighbor B never interferes or objects, Neighbor A will have a hostile claim of right to that flower bed. Neighbor A might exercise that claim of right if Neighbor B or his successors in interest suddenly attempt to cut the flowers for their own dining room table. The failure of Harris or the Kezelians, or any of their agents, to complain despite more than 15 years of noticeable encroachment on the land is the very nature of an adverse possession claim, not evidence that adverse possession did not occur. Ultimately, contrary to the court's reasoning, Harris's failure to "complain that the people are cutting the grass to that outlot" was evidence that Harris was ceding his property interest, whether knowingly or not.

### E. CLAIM OF RIGHT

The final element of an adverse possession action is a "claim of right." Our Supreme Court described the term "claim of right" in *Smith v Feneley*, 240 Mich 439, 441-442; 215 NW2d 353 (1927):

> The belief or knowledge of the adverse claimant is not as important as his intentions. The intention is the controlling consideration, and it is not the knowledge or belief that another has a superior title, but the recognition of that title that destroys the adverse character of possession. Claim of title or claim of right is essential to adverse possession, but it is not necessary that an adverse claimant should believe in his title, or that he should have any title. He may have no shadow of title and be fully aware of that fact, but he must claim title. He may go into possession without any claim of title, but his possession does not become adverse until he asserts one; and he may assert it by openly exercising acts of ownership, with the intention of holding the property as his own to the exclusion of all others.

> Claim of title is where one enters and occupies land, with the intent to hold it as his own, against the world irrespective of any shadow or color or right or title.

It is not necessary, however, that the party in possession should have expressly declared his intention to hold the property as his own, nor need his claim thereto be a rightful one. That his acts and conduct clearly indicate a claim of ownership is enough. [Cleaned up.]

This element destroys the Goings' adverse possession claim. The Goings specifically and repeatedly indicated that they knew they did not own Outlot A and that the developer did. They further indicated that they were not trying to create an ownership interest. This "recognition" that "another has a superior title" "destroy[ed] the adverse character of [the Goings'] possession." Accordingly, the circuit court properly summarily dismissed the Goings' claim to title by adverse possession.

The circuit court posited that the Andersons and plaintiffs could not have exerted an ownership interest under a claim of right because the land was specifically designated on the publicly recorded plat map as "for future road purposes." Plaintiffs correctly observe that the gravamen of an adverse possession claim is that it invades an otherwise legally protected interest. *Beach v Lima Twp*, 283 Mich App 504, 513-514; 770 NW2d 386 (2009), aff'd 489 Mich 99 (2011). That the landowner's property interest was legally protected by a plat map designation does not insulate it from adverse possession.

Plaintiffs' failure to secure a survey before their purchase and decision to effectuate a survey waiver does not change this result. As described in ICLE Michigan Real Estate Practice & Forms, § 16.2:

Surveys have four main functions in most real estate transaction[s]:

1. providing an adequate legal description

2. fixing boundaries in relation to adjoining property and structures

3. confirming the access to the property

4. disclosing and graphically locating easements, encroachments, structures, or other matters that affect the use of a parcel[.]

Had plaintiffs secured a survey before purchasing the home from the Andersons, they would have learned that Outlot A existed and both they and the Andersons would have learned that Lot 85's border fell short of expectations.

Even with a survey, however, either plaintiffs or the Andersons could have filed a quiet title action. According to Thomas Anderson, the boundary stakes were inaccurately placed when he and his wife constructed their home on Lot 85 in 1998. The Andersons relied on those boundary stakes when they poured their driveway, installed sprinkler heads, and placed their mailbox and landscaping. By the time of the 2015 sale, the Andersons could have argued that they had adversely possessed at least that portion of Outlot A for the statutory period. Plaintiffs could then file an action to quiet title against the Kezelians by tacking their period of adverse possession to that of the Andersons. The survey simply would have given the Andersons and plaintiffs earlier notice of the cause of action.

Waiving the survey as to the title insurance company had no impact on plaintiffs' ability to file suit. The signed survey waiver merely eliminated the title insurance company's duty to protect its clients' (plaintiffs') interests; in other words, the waiver merely created an exception to insurance coverage. Plaintiffs did not waive their legal rights or their right to personally pursue them at their own cost.

## F. TACKING

Finally, the Kezelians claim that plaintiffs cannot tack their period of adverse possession onto that of the Andersons because no one told plaintiffs during the sale process that Lot 85 extended to the midway point of Outlot A.

> A party may "tack" on the possessory periods of predecessors in interest to achieve [the statutory] fifteen-year period by showing privity of estate. This privity may be shown in one of two ways, by (1) including a description of the disputed acreage in the deed, or (2) an actual transfer or conveyance of possession of the disputed acreage by parol statements made at the time of conveyance. [*Killips v Mannisto*, 244 Mich App 256, 259; 624 NW2d 224 (2001) (cleaned up).]

Plaintiffs do not claim that the Andersons described Outlot A as part of the transfer in the deed, nor have they presented evidence that they were expressly told that Lot 85 extended to the midpoint of Outlot A. Rather, the real estate agent described the area as private and plaintiffs *assumed* their lot included half of Outlot A because the front portion of the outlot was manicured like an extension of the front yard. However, there is at least a question of fact that the realtor's communication, especially in light of the objective evidence plainly visible on the property, left plaintiffs with the understanding that their lot extended to the 1998 survey stake placement. The realtor walked the property with plaintiffs, and plaintiffs observed with their realtor the placement of the driveway, mailbox, and sprinkler heads, which, as discussed, all strongly suggest a wider lot. Accordingly, summary disposition was inappropriate on this issue as well.

Ultimately, plaintiffs created genuine issues of material fact regarding the elements of their adverse possession claim. Accordingly, the court improperly granted summary disposition in the Kezelians' favor as to plaintiffs. The circuit court should have instead denied the Kezelians' and plaintiffs' motions and continued the proceedings. We therefore vacate the circuit court's summary disposition order as to plaintiffs Edinger-Fowler and Hamilton only. The trial court's grant of summary disposition in favor of the Kezelians as to the Goings was proper, albeit for incorrect reasons.

## IV. ACQUIESCENCE

Plaintiffs and the Goings alternatively argued that the parties had settled on a new boundary line for Lots 85 and 37—down the middle of Outlot A. Plaintiffs alternatively contend that the parties acquiesced to a new boundary marked by the 1998 survey stakes.

The doctrine of acquiescence provides a manner for quieting title when neighbors have acquiesced to a boundary line between their properties. *Killips*, 244 Mich App at 260. A "precise line" is not necessary as long as the parties share a general understanding of the fictional

boundary line for the statutory period. *Walters v Snyder*, 239 Mich App 453, 458; 608 NW2d 97 (2000). The claimant need only establish acquiescence by a preponderance of the evidence, rather than by the stricter clear-and-cogent-evidence standard. *Id*. "There are three theories of acquiescence . . . : (1) acquiescence for the statutory period; (2) acquiescence following a dispute and agreement; and (3) acquiescence arising from intention to deed to a marked boundary." *Sackett v Atyeo*, 217 Mich App 676, 681; 552 NW2d 536 (1996). Plaintiffs attempted to establish the first type of acquiescence: that the parties had acquiesced for 15 years to a property boundary down the center of Outlot A. For this type of acquiescence, plaintiffs were not required to establish any historical dispute regarding the proper boundary line; a mere mistake about the actual boundary suffices. *Id*. at 681-682. Proof that parties have treated a boundary as the property line for the statutory period suffices to prove acquiescence. *Mason v City of Menominee*, 282 Mich App 525, 529-530; 766 NW2d 888 (2009).

The difficulty with plaintiffs' and the Goings' claims to half of Outlot A on the theory of acquiescence is that they are not claiming a new shared border with the owners of Outlot A, but with each other. The Goings unambiguously testified that they knew where the true property line lay. Moreover, the Goings did not innocently acquiesce in a new boundary for the statutory period. Accordingly, neither plaintiffs nor the Goings created a genuine issue of material fact that the parties had acquiesced to a new boundary in the middle of Outlot A.

Nevertheless, as discussed, plaintiffs presented evidence tending to show that their predecessors and the Kezelians' predecessors acquiesced in a new boundary line somewhere closer to the true border of Lot 85 but within Outlot A. Thomas Anderson testified that he relied upon the placement of survey stakes when he constructed his home, poured his driveway, and installed sprinkler heads and a mailbox. Because no one else would have had any reason to place those survey stakes, it can reasonably be presumed that Harris (the true owner at the time) or his agents chose their location and placed them there. By placing the stakes, Harris would have created a new boundary upon which the Andersons and then plaintiffs have relied since 1998, more than 15 years before the Kezelians attempted to retake this strip of land along Lot 85's border.[2]

On remand, plaintiffs Edinger-Fowler and Hamilton may continue to pursue their claim to title by acquiescence as well as their claim to title by adverse possession. However, we continue to affirm the circuit court's dismissal of the Goings' claims.

## V. LANDLOCKED PROPERTY

The Kezelians finally argue that even if they were to lose title to the entirety of Outlot A through adverse possession or acquiescence, they hold an easement by necessity across Outlot A to access Parcel 6, which would otherwise be landlocked. Because the trial court incorrectly granted summary disposition in favor of the Kezelians on other grounds, it did not reach this

---

[2] We note that a plaintiff need not present evidence of a parol transfer to tack periods of acquiescence to a new boundary line. *Killips*, 244 Mich App at 260.

issue. We do not decide it, but because this issue will become relevant on remand, we will provide some guidance for the parties and the trial court.

"An easement is a right to use the land burdened by the easement rather than a right to occupy and possess the land as does an estate owner." *Schumacher v Dep't of Natural Resources*, 275 Mich App 121, 130-131; 737 NW2d 782 (2007). Relevant to the instant appeal:

> An easement by necessity may be implied by law where a landowner splits its property so that one of the resulting parcels is landlocked except for access across the other parcel. An easement by necessity arises either by grant or reservation: by grant in a case where the grantor created a landlocked parcel in its grantee, or by reservation where the grantor splits its property and leaves itself landlocked. [*Id*. (cleaned up).]

> Such an easement cannot arise out of "mere inconvenience." *Waubun Beach Ass'n v Wilson*, 274 Mich 598, 609; 265 NW 474 (1936). Rather, "strict necessity" is required. *Charles A Murray Trust v Futrell*, 303 Mich App 28, 48; 840 NW2d 775 (2013). For example, the fact that access to a parcel is over a steep incline does not confer necessity. See *Schadewald v Brule*, 225 Mich App 26, 41 n 4; 570 NW2d 788 (1997). Furthermore, an easement by necessity only addresses access *to* a particular parcel itself, not to any particular location *within* the parcel. *Charles A Murray Trust*, 303 Mich App at 55-57.

However, *Waubun Beach* cited with approval *Pettingill v Porter*, 8 Allen (90 Mass) 1; 85 Am Dec 671 (1864), for the proposition that an easement by necessity might arise if accessing the premises would be disproportionately expensive. *Waubun Beach*, 274 Mich at 613. Our Supreme Court has indicated that necessity may arise if property is only accessible by boat, because the water would be frozen for part of the year. *Rodal v Crawford*, 272 Mich 99, 105; 261 NW 260 (1935). Furthermore, our Supreme Court has found it "wholly inadequate" where the only lawful access was over 10-foot-wide walkways traversing neighbors' lawns, which "have never been used for vehicular traffic and would be wholly inadequate for the same." *Todd v Nobach*, 368 Mich 544, 550; 118 NW2d 402 (1962).[3] Necessity clearly cannot be founded on mere inconvenience, but it may arise if the inconvenience is so extreme that it creates an effective physical impossibility.

Furthermore, necessity depends on a lack of a *lawful* way to access the property. *Waubun Beach*, 274 Mich at 611. The Kezelians testified that any access to Parcel 6 other than across Outlot A would require construction of a road through wetlands. Doing so would be physically challenging, but more importantly, the Department of Natural Resources would not permit the Kezelians to construct such a road.[4] Thus, short of donning waders and crossing the

---

[3] *Todd* did not explicitly discuss the doctrine of easement by necessity.

[4] The Kezelians admitted that they did not make any request to the Department of Natural Resources, but rather relied on their engineers' opinion that doing so would be futile.

wetlands on foot, the Kezelians would have neither a practical nor a lawful way to access Parcel 6. Easements by necessity are "supported by the public policy favoring the productive and beneficial enjoyment of property." *Schmidt v Eger*, 94 Mich App 728, 732; 289 NW2d 851 (1980). Wetlands that cannot legally or effectively be traversed in a way that permits use of the property render the property landlocked.

However, "[t]he scope of an easement by necessity is that which is reasonably necessary for proper enjoyment of the property, with minimum burden on the servient estate." *Schumacher v Dep't of Natural Resources*, 256 Mich App 103, 106; 663 NW2d 921 (2003). Consequently, an easement by necessity over Outlot A may not be guaranteed to span the entire width of the outlot or permit the installation of any particular kind of road. On remand, the trial court must address the Kezelians' argument that they enjoy an easement by necessity over Outlot A, as well as the size and scope of that easement and any other balancing of the equities it deems necessary. We do not resolve any factual issues regarding the Kezelians' easement argument, and no such resolution should be implied.

## VI. CONCLUSION

The circuit court incorrectly dismissed plaintiffs' claims to title to Outlot A based on adverse possession and acquiescence, because there remained questions of fact regarding the elements of those claims. The trial court properly dismissed the Goings' similar allegations, albeit for incorrect reasons. Finally, the Kezelians have presented a plausible claim to an easement by necessity to access Parcel 6 that the trial court must address.

Accordingly, we vacate the trial court's grant of summary disposition in favor of the Kezelians as against Edinger-Fowler and Hamilton, we affirm the trial court's grant of summary disposition in favor of the Kezelians as against the Goings, and we remand for further proceedings consistent with this opinion, including consideration of the Kezelians' claim to an easement by necessity. We do not retain jurisdiction. We direct that the parties shall each bear their own costs of this appeal. MCR 7.219(A).

/s/ Amy Ronayne Krause
/s/ Elizabeth L. Gleicher
/s/ Anica Letica